FILED
United States Court of Appeals
Tenth Circuit

August 14, 2014

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ENTEK GRB, LLC,

      Plaintiff - Appellant,

v.

STULL RANCHES, LLC,

      Defendant - Appellee.

------------------------------------------

WESTERN ENERGY ALLIANCE,

      Amicus Curiae.

No. 13-1172

---

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:11-CV-01557-PAB-KLM)**

---

Lucy H. Deakins (L. Poe Leggette with her on the briefs), of Fulbright &
Jaworski LLP, Denver, Colorado, for Plaintiff-Appellant/Cross-Appellee.

Dudley W. Von Holt (Bruce D. Ryder and James M. Cox with him on the briefs),
of Thompson Coburn LLP, St. Louis, Missouri, for Defendant-Appellee/Cross-
Appellant.

William E. Sparks and Bret A. Sumner, of Beatty & Wozniak, P.C., Denver,
Colorado, for Amicus Curiae Western Energy Alliance.

---

Before **GORSUCH**, **BALDOCK**, and **BACHARACH**, Circuit Judges.

**GORSUCH**, Circuit Judge.

When you own property in the West you don't always own everything from the surface to the center of the Earth. Someone else might own the minerals lying underground and the right to access them. Someone else still might own the right to use the water flowing through your property. All this can invite confusion — and litigation.

Ours is such a case, a battle between ranchers and miners over property claims they trace back to separate government grants an age ago. Stull runs a grouse hunting business on its surface estate in rural Colorado. Entek leases from the federal government the right to explore for and develop minerals under much of Stull's surface and adjoining surface estates. This dispute arose when Entek asked permission to enter Stull's surface estate — both to develop new oil well sites on Stull's land and to get at one of its existing wells located on an adjacent surface estate owned by the Bureau of Land Management. Along the way, Entek pointed out that the only available road to the well on BLM's estate crosses Stull's land. Still, Stull was not moved. Concerned that Entek's presence would unsettle its grouse, Stull refused any access. With that, Entek was left to seek relief from the district court. At summary judgment, the district court held that Entek was entitled to access portions of Stull's surface to mine certain leases

lying below. But the court also held that Entek was entitled to no more than this — in particular, Entek could not cross Stull's surface to service the well on the adjacent BLM land. Entek appeals, asking us to supply the fuller relief it sought, not merely what the district court granted. We believe we must do just that.

The reason why takes us back some way. Everyone knows that through the late nineteenth and early twentieth centuries the government sought to induce westward expansion by affording generous land grants to homesteaders. Everyone knows, too, that as time wore on that generosity waned. By 1916, some complained that the government's policy of trying to induce ranchers and farmers to work the land had turned into a bonanza for mining interests — with the government giving away not only the surface but also the oil, gas, and other minerals lying beneath. In response to this criticism and with the belief that the buried riches under these lands should inure to the benefit of the whole people, not lucky homesteaders, Congress passed the Stock-Raising Homestead Act of 1916 and ensured future homestead grants would come with strings attached. Pub. L. No. 64-290, 39 Stat. 862 (codified at 43 U.S.C. §§ 291-301); *see also Watt v. W. Nuclear, Inc.*, 462 U.S. 36, 47-51 (1983); *United States v. Midwest Oil Co.*, 236 U.S. 459, 466-67 (1915); *Aulston v. United States*, 915 F.2d 584, 585-87 (10th Cir. 1990); Matthew L. King, *Prospectors' Access to Stock-Raising Homestead Act Lands*, 20 Colo. Law. 247 (1991).

-3-

Those strings still bind.  Stull is the successor in interest to land grants provided under the 1916 Act.  And under that law all mineral rights are expressly reserved by the government, along with at least two other rights:  (1) the right to enter and use so much of the surface as might be "reasonably incident" to the exploration and removal of mineral deposits, and (2) the right to enact future laws and regulations regarding the "disposal" of the mineral estate.  *See* 43 U.S.C. § 299(a).  This second right, moreover, sweeps broadly when it places the minerals at the government's "disposal," signifying not just the government's power to "bestow[]" or "assign[]" the minerals, but also a power to "manage[]," "make use of," and "deal with [them] as [it] pleases."  4 *The Oxford English Dictionary* 820 (2d ed. 1989).  No doubt Congress reserved a broad right to enact future laws regarding its mineral estate because by 1916 it hadn't yet settled on the "procedure by which all mineral resources were to be administered" and in the meantime "sedulously sought to preserve" the chance to do just that.  *United States v. Union Pac. R.R. Co.*, 353 U.S. 112, 116 (1957); *see also W. Nuclear*, 462 U.S. at 47-51; *Andrus v. Utah*, 446 U.S. 500, 509 (1980).

At least one of those subsequently enacted laws poses a problem for Stull.  To see why, though, still a little more history is helpful.  Pursuant to the rights it reserved in 1916, Congress passed the Mineral Leasing Act in 1920, a first step toward establishing a legal framework for the exploitation of minerals lying underneath homestead lands.  Pub. L. No. 66-146, 41 Stat. 437 (codified in

scattered sections of 30 U.S.C.); *see also Kirkpatrick Oil & Gas Co. v. United States*, 675 F.2d 1122, 1124 (10th Cir. 1982); *Aulston*, 915 F.2d at 587; *Kinney-Coastal Oil Co. v. Kieffer*, 277 U.S. 488, 504 (1928); *Union Pac. R.R. Co.*, 353 U.S. at 136 (Frankfurter, J., dissenting) (in the Mineral Leasing Act "Congress did what it had not done [before] — it set forth a plan for the development of the minerals that the 1909-1916 Acts had reserved for the United States").  But as sometimes happens with well-meaning legislation, the Mineral Leasing Act wound up inviting new and unintended problems of its own.  The statute allowed the Secretary of Interior to lease mineral development rights for individual tracts of land to private mining concerns.  The problem, of course, is that mineral deposits don't always follow plat lines.  And soon enough developers began draining pools of oil and gas lying partially within their own lease boundaries but extending into contiguous leaseholds.  At first, the law reacted to all this in a very wild west sort of way — first come, first served.  In time, though, Congress came to judge this arrangement inefficient because it often yielded frantic, duplicative, and crazy-quilt exploration activities in what amounted to a single oil and gas field.  *See, e.g.*, 1 Nancy Saint-Paul, *Summers Oil and Gas* § 3:7 (3d ed. 2013); Robert E. Hardwicke, *The Rule of Capture and Its Implications as Applied to Oil and Gas*, 13 Tex. L. Rev. 391 (1935); Bruce M. Kramer & Owen L. Anderson, *The Rule of Capture — An Oil and Gas Perspective*, 35 Envtl. L. 899 (2005).

Bowing to geologic reality, Congress responded with an amendment to the Mineral Leasing Act allowing all the lessees in a single field or area to develop "a cooperative or unit plan of development or operation of such pool, field, or like area." 30 U.S.C. § 226(m); *see also Amoco Prod. Co. v. Heimann*, 904 F.2d 1405, 1410 (10th Cir. 1990). Under the law, these "unitization" agreements must be approved by the Secretary of Interior, and the Secretary is empowered to alter existing federal minerals leases to accommodate these agreements in any way "he may deem necessary or proper to secure the proper protection of the public interest." 30 U.S.C. § 226(m).

That's where the trouble really starts for Stull. It does because the Secretary has approved a unitization agreement covering a 40,000 acre region that includes the relevant portions of Stull's surface estate and BLM's land. Known as the Focus Ranch Unit Agreement, the Agreement seeks to ensure the efficient distribution of mining assets and profits among the region's mineral leaseholders. Toward that end, the document provides that drilling and producing operations "upon any tract of unitized lands will be accepted and deemed to be performed upon and for the benefit of each and every tract of unitized land." The document further explains that the Secretary has exercised his authority to declare any contrary provision in any individual mineral lease or federal regulation subservient to this new plan. *See* Aplt. App. at 1816. Neither is language in the Focus Ranch Unit Agreement unique — it tracks a model agreement that appears

in the code of federal regulations. *See* 43 C.F.R. § 3186.1(18)(b). Indeed, the Focus Ranch Unit Agreement tracks the statute itself, which codifies the understanding that "operations or production pursuant to [a unitization] agreement shall be deemed to be operations or production as to each such lease committed thereto." 30 U.S.C. § 226(m).

How does this pose a problem for Stull? No one seriously disputes that Entek may enter Stull's surface estate above a particular mineral lease to explore or mine the part of that leasehold that lies under Stull's surface. This right clearly traces back to the federal government's first reserved right in the 1916 Stock-Raising Homestead Act — the right to "reenter and occupy" as much of the surface as needed for purposes "reasonably incident" to the mining of minerals beneath. 43 U.S.C. § 299(a). Still, Stull says, this statutory language does not authorize Entek to cross the surface above one of its leaseholds to service either a different leasehold under Stull's property or even the same leasehold under a surface estate owned by someone else. But even assuming Stull's reading of the first right reserved in the 1916 statute is correct in this respect, it still fails to account for the second right reserved in that same law. Under the second reserved right — the right to adopt *future* rules regarding the disposition of its mineral estate — the government has enacted § 226(m) and approved the Focus Ranch Unit Agreement. Under those provisions, any mining activity on any leasehold in the unitized area is deemed to occur on *all* leaseholds. Given this,

and given the first reservation in the 1916 Act, it follows that Entek, the designated Focus Ranch Unit operator, can enter and occupy the surface above any leasehold in the unitized area to the extent that surface access is reasonably incident to mining in any leasehold in the unitized area. No longer is the right to enter and occupy the surface even arguably limited to particular leaseholds or surface estates. The agreement's designated operator may now use any portion of the surface in the unit to aid its mining activities in the unit without respect to individual lease or surface boundaries. Put differently, the operator may now "reenter and occupy" so much of the surface in the unitized area as may be "reasonably incident" to extracting minerals from the unit.[1]

Neither is there anything novel about any of this. In *Coosewoon v. Meridian Oil Co.*, this court recognized some time ago that the purpose and effect of unitization is often to ensure an entire oil and gas field may "be operated as a single entity, without regard to surface boundary issues." 25 F.3d 920, 923 n.1 (10th Cir. 1994). The Ninth Circuit has reached the same conclusion — and so

_____

[1] Of course, the 1916 Act requires that a mineral lessee seeking to exercise its right to "reenter and occupy" must obtain the surface owner's agreement or post with the federal government a bond of a "good and sufficient" amount. 43 U.S.C. § 299(a); *see also Gilbertz v. United States*, 808 F.2d 1374, 1379 (10th Cir. 1987) (suggesting that an agreement or bond is a "condition[] precedent" to exercising the right to "reenter and occupy"). Obviously Entek lacks Stull's agreement, so it would seem the company must post a bond. We do not mean to suggest that unitization eliminates this statutory requirement. Neither do we mean to suggest Entek has satisfied the requirement; the question of a bond simply has not been raised in this case.

-8-

has the Department of Interior.  *See Norfolk Energy, Inc. v. Hodel*, 898 F.2d 1435, 1438 (9th Cir. 1990) ("Unitization permits the entire oil and gas field (or a substantial portion of it) to be operated as a single entity, without regard to surface boundary issues.") (internal quotation marks and brackets omitted); Bureau of Land Management, *Draft Handbook H-3180-1:  Unitization (Exploratory)* 1 (1992) ("By effectively eliminating internal property boundaries within the unit area, unitization permits the most efficient and cost-effective means of developing the underlying oil and gas resources."); *see also* 6 Howard R. Williams & Charles J. Meyers, *Oil and Gas Law* §§ 901, 910, 921.3 (LexisNexis 2013); Bruce M. Kramer & Patrick H. Martin, *The Law of Pooling and Unitization* § 20.06[1] (3d ed. 2013).

This result conforms as well with § 226(m)'s express statutory purposes. As we've seen and the statute itself says, its aim is to "avoid waste" in the exploration and exploitation of an oil or gas field.  30 U.S.C. § 226(m); *see also* 43 C.F.R. § 3186.1; *Union Pac. R.R. Co.*, 353 U.S. at 116.  Instead of worrying about a checkerboard of titles and leases for lawyers to play on and fight over, the law seeks to permit geologists and engineers to arrange their assets on the surface efficiently in order to follow the underground boundary lines of mineral deposits that nature dictates.  In this case, that means Entek has the right (among other things) to use an already existing road above one leasehold to service an existing

well above another — rather than being forced to incur the waste of having to build a new and duplicative byway.[2]

To all this, Stull responds by pointing to a passage in *Mountain Fuel Supply Co. v. Smith*, in which this court stated that surface rights are not affected by unitization "other than to the extent that the particular leases covering the minerals under the defendants' surface may have been actually and legally modified thereby." 471 F.2d 594, 597 (10th Cir. 1973). But this statement hardly helps Stull. *Mountain Fuel* didn't hold that unitization *never* has an effect on surface access rights — it simply observed that any alteration to surface access rights depends on the terms of the unitization agreement in question and whether it "actually and legally" modifies the "particular leases covering the minerals under the defendants' surface." *Id.* at 597. And that is precisely what the Focus Ranch Unit Agreement does. The Agreement expressly modifies all mineral leases in the region to make plain that operations "upon any tract of unitized lands" are deemed to occur on all other portions of unitized lands. The plain

---

[2] Unitization policies exist as well under analogous state laws. Though it's hardly dispositive when it comes to interpreting federal law, it is perhaps not nothing either that the "majority rule" in the states is the same as it is in federal law, permitting parties to "pool[] . . . the right to use the surface of any tract in the drilling unit to produce gas or oil . . . ." *Miller v. N.R.M. Petroleum Corp.*, 570 F. Supp. 28, 30 (N.D. W. Va. 1983); *see also Kysar v. Amoco Prod. Co.*, 93 P.3d 1272 (N.M. 2004); *Reimer v. Gulf Oil Corp.*, 664 S.W.2d 456 (Ark. 1984); *Nelson v. Texaco Inc.*, 525 P.2d 1263 (Okla. Civ. App. 1974); *Miller v. Crown Cent. Petroleum Corp.*, 309 S.W.2d 876 (Tex. Civ. App. 1958). *But see Robinson v. Robbins Petroleum Corp.*, 501 S.W.2d 865 (Tex. 1973).

upshot of that language is to pool the mineral exploitation rights of all leaseholders, including their surface access rights.[3]

Separately, Stull complains it wasn't party to the Focus Ranch Unit Agreement. But it doesn't begin to suggest why it had to be. Stull doesn't question that back in 1916 the government expressly retained the minerals under what's become Stull's surface estate for the benefit of the public; expressly retained the right to enter and occupy the surface estate as needed to reach those minerals; and expressly retained the (unilateral) right to modify its plans for disposing of its minerals as needed in the future. Stull doesn't dispute that § 226(m) represents one such law — or that § 226(m) authorized the Department of the Interior to issue 43 C.F.R. § 3186.1(18) and approve the Focus Ranch Unit Agreement. Maybe — despite all this — some lawful authority limits the government's ability to update its disposition plans or at least affords some measure of compensation to those property owners the updates adversely affect.

---

[3] Stull's citation to *Bourdieu v. Seaboard Oil Corp.*, 146 P.2d 256 (Cal. Ct. App. 1944), is similarly unhelpful to its cause. That 1944 state court decision doesn't address (and couldn't have addressed) the effect of the unitization agreement at issue here — or the federal regulation on which it was based — all of which came many years later. A similar problem attends Stull's reliance on an administrative decision, *International Petroleum & Exploration Operating Corp.*, 178 IBLA 1 (2009). In that case, the Interior Department Board of Land Appeals didn't try to give effect to § 226(m) and 43 C.F.R. § 3186.1(18)(b), let alone the specific unitization agreement before us. Meanwhile, the Board has itself elsewhere acknowledged that unitization *can* permit an entire field to be "operated as a single entity, without regard to lease boundaries." *Gas Dev. Corp.*, 177 IBLA 201, 208 (2009). So, too, has the BLM, as we've already noted.

*See generally* U.S. Const. amend. V (takings clause); *Ark. Game & Fish Comm'n v. United States*, 133 S. Ct. 511, 522 (2012) (private property invasions authorized by the government may give rise to takings claims). But in this case Stull hasn't seriously attempted any argument along these lines. If a legal argument in this area does exist, it seems it will have to come from future litigants in a future case. For its part, Stull leaves us at the end of the day with only a policy complaint — a complaint that federal policy as currently constructed is too generous to subsurface interests and insufficiently solicitous to surface interests. We can certainly understand that point of view. But in the never-ending tug of war between ranchers and miners — all of whom derive their interests from federal land grants — it is for Congress to set policy and this court to construe it. If Stull seeks revisions to federal land use policy its efforts would be better directed to legislators than courts.[4]

Finally, Stull argues that we should employ nonmutual offensive issue preclusion to bar Entek from pursuing any argument about the scope of its rights

---

[4] The closest Stull comes to mustering an argument that the government is *legally powerless* to do as it has done comes when it cites state law for the general principle that a contract usually can't be enforced against those who aren't party to it. But in dealing with land grants from the federal government we're about as far removed from private contracting as it gets. No one's suggesting Stull contracted away rights it had; rather Entek's arguing that the federal government reserved mineral rights back in 1916 and is exercising those rights through its lessee today. *Cf. W. Nuclear*, 462 U.S. at 59 (Supreme Court instructing that "[l]and grants are construed favorably to the Government . . . [and] if there are doubts they are resolved for the Government, not against it.").

under the Focus Ranch Unit Agreement. Stull points out that Entek's current leases were previously held by Clayton Williams. Stull notes that some years ago Clayton Williams fought another surface owner (Three Forks Ranch) over the right to traverse that owner's property to reach a well on an adjacent surface owner's tract — the very issue presented here. Stull observes, too, that before the district court Clayton Williams lost its argument that the Focus Ranch Unit Agreement permitted the access it sought. So, Stull reasons, Entek should be precluded from pursuing that same issue here.

But Stull's story paints only half the picture. Although a never-appealed district court judgment may sometimes support preclusion, it turns out that Clayton Williams didn't appeal the judgment in its case only because it reached a deal with Stull — a deal allowing it to traverse Stull's property to reach the well in question. And, it turns out that Stull eventually terminated the agreement. Neither was Entek ever assigned any rights under this agreement, or otherwise its beneficiary. Indeed, the parties don't dispute the fact that Entek lacks any authority to pursue a claim related to the agreement's demise.

This fuller picture of the facts, we believe, precludes preclusion. Before applying nonmutual offensive issue preclusion, we require evidence of "privity" between a party in the former litigation and the party against whom preclusion is asserted in the current litigation. *See, e.g.*, *Century Indem. Co. v. Hanover Ins. Co.*, 417 F.3d 1156, 1159 (10th Cir. 2005). Of course, privity is but a label. But

-13-

it is a label that seeks to convey the existence of a relationship sufficient to give courts confidence that the party in the former litigation was an effective representative of the current party's interests. *See, e.g.*, *Taylor v. Sturgell*, 553 U.S. 880, 894 n.8 (2008) (in issue preclusion doctrine the term privity has come to be used "as a way to express the conclusion that nonparty preclusion is appropriate"); *Headwaters Inc. v. U.S. Forest Serv.*, 399 F.3d 1047, 1052-53 (9th Cir. 2005) ("Privity is a legal conclusion designating a person so identified in interest with a party to former litigation that he represents precisely the same right in respect to the subject matter involved." (internal quotation marks and ellipsis omitted)); 18A Charles Allen Wright et al., *Federal Practice and Procedure* §§ 4448-49 (2d ed. 2014); Restatement (Second) of Judgments §§ 34, 43 (1982).

That much is lacking here. True, Clayton Williams and Entek bear a close relationship. Entek is the successor in interest to Clayton Williams when it comes to the federal mineral leases. And successors and assigns to a property interest are often considered sufficiently "in privity" for preclusion purposes. Normally, after all, the predecessor has the same economic interests to worry about and defend as the successor. *See, e.g.*, 18A Wright et al., *supra*, § 4448. But as we've seen, Entek is not a successor in interest to all of Clayton Williams's relevant rights and interests. When Clayton Williams decided to forgo future litigation because of a deal it struck with Stull, it sought to (and did) protect only

-14-

*its* personal interests — not those of similarly situated future lessees of the same property. In a critical respect, then, Clayton Williams didn't — and didn't intend to — serve as a proxy for its successor's interests. Neither could Stull have reasonably thought itself protected against other future adversaries. At the time of the deal, Stull knew (even insisted) that the deal necessary to end the litigation would be good for Clayton Williams only. To be clear, we don't mean to suggest that the mere fact a case settles through private agreement before an appeal is decided suffices to preclude preclusion in all cases. Instead, we much more narrowly decline to find sufficient "privity" for issue preclusion purposes when the parties to a litigation-ending agreement could not have reasonably thought the deal would inure to the benefit of other parties and so protect against their future claims. *See generally* 18A Wright et al., *supra*, § 4462 (in determining "privity" question "substantial weight should be given to the reasonable expectations of the victor" in the prior litigation as to whether or not it "would protect against relitigation by any future adversary"); Restatement (Second) of Judgments § 43 cmt. a ("privity" lacking where predecessor to a property interest litigated only a "personal" right rather than one that "affect[ed] the property itself").

With that said, and having explained that the Focus Ranch Unit Agreement has the effect of providing Entek all the relief it seeks (under what it calls claim three), we have no need to address the company's alternative legal theories for reaching the same result (what it calls claims one and two). The district court's

grant of summary judgment in favor of Stull is vacated and the case is remanded

for further proceedings consistent with the terms of this opinion.