**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 16, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

UTE INDIAN TRIBE OF THE
UINTAH AND OURAY
RESERVATION,

    Plaintiff–Counterclaim Defendant–
    Appellant/Cross-Appellee,

v.

STATE OF UTAH; DUCHESNE
COUNTY, a political subdivision of
the State of Utah,

    Defendants–Counterclaimants–
    Appellees in No. 14-4028 and
    Defendants–Counterclaimants in
    No. 14-4031,

UINTAH COUNTY, a political
subdivision of the State of Utah,

    Defendant–Counterclaimant–
    Third-Party Plaintiff–Appellee/
    Cross-Appellant,

ROOSEVELT CITY, a municipal
corporation; DUCHESNE CITY, a
municipal corporation; MYTON, a
municipal corporation,

    Defendants,

BRUCE IGNACIO, Chairman of the
Ute Tribal Business Committee, in his
official capacity,

Nos. 14-4028 and 14-4031

Defendant–Third-Party Defendant,

and

BUSINESS COMMITTEE FOR THE UTE TRIBE OF THE UINTAH AND OURAY RESERVATION; GORDON HOWELL, Chairman of the Business Committee; RONALD J. WOPSOCK, Vice Chairman of the Ute Tribal Business Committee, in his official capacity; STEWART PIKE, member of the Ute Tribal Business Committee, in his official capacity; TONY SMALL, member of the Ute Tribal Business Committee, in his official capacity; PHILIP CHIMBURAS, member of the Ute Tribal Business Committee, in his official capacity; PAUL TSOSIE, Chief Judge of the Ute Tribal Court, in his official capacity; WILLIAM REYNOLDS, Judge of the Ute Tribal Court, in his official capacity,

Third-Party Defendants.

Nos. 14-4028 and 14-4031
(continued)

---

UTE INDIAN TRIBE OF THE UINTAH AND OURAY RESERVATION, Utah, a federally recognized Indian Tribe,

Plaintiff–Appellant,

v.

STATE OF UTAH; WASATCH COUNTY, a political subdivision of

No. 14-4034

2

the State of Utah; GARY HERBERT,
in his capacity as Governor of Utah;
SEAN D. REYES, in his capacity as
Attorney General of Utah; SCOTT
SWEAT, in his capacity as County
Attorney for Wasatch County, Utah;
TYLER J. BERG, in his capacity as
Assistant County Attorney for
Wasatch County, Utah,

No. 14-4034
(continued)

    Defendants–Appellees.

---

UINTAH COUNTY,

    Amicus Curiae.

---

**Appeal from the United States District Court
for the District of Utah
(D.C. Nos. 2:75-CV-00408-BSJ and 2:13-CV-01070-DB-DBP)**

---

Frances C. Bassett and Jeffrey S. Rasmussen (Sandra L. Denton, Thomas W.
Fredericks, Todd K. Gravelle, Matthew J. Kelly, and Jeremy J. Patterson with
them on the briefs) of Fredericks Peebles & Morgan LLP, Louisville, Colorado,
for the Ute Indian Tribe of the Uintah and Ouray Reservation.

Parker Douglas, Utah Federal Solicitor (Randy S. Hunter and Katharine H.
Kinsman, Assistant Utah Attorneys General, and Bridget Romano, Utah Solicitor
General, with him on the briefs), Salt Lake City, Utah, for the State of Utah, Gary
Herbert, and Sean D. Reyes.

Jesse C. Trentadue (Britton R. Butterfield, Carl F. Huefner, and Noah M.
Hoagland, with him on the briefs) of Suitter Axland, PLLC, Salt Lake City, Utah,
for Duchesne County, Wasatch County, Scott Sweat, and Tyler J. Berg.

E. Blaine Rawson of Ray Quinney & Nebeker P.C., Salt Lake City, Utah
(Greggory J. Savage, Matthew M. Cannon, and Calvin R. Winder of Ray Quinney
& Nebeker, Salt Lake City, Utah, and G. Mark Thomas, Uintah County Attorney,

3

and Jonathan A. Stearmer, Chief Deputy Uintah County Attorney–Civil, Vernal, Utah, with him on the briefs), for Uintah County.

---

Before **HARTZ**, **GORSUCH**, and **MORITZ**, Circuit Judges.

---

**GORSUCH**, Circuit Judge.

---

In our layered system of trial and appellate courts everyone's assured at least two chances to air a grievance. Add to this the possibility that a lawsuit might bounce back to the trial court on remand or even rebound its way to appeal yet again — or the possibility that an issue might win interlocutory review — and the opportunities to press a complaint grow abundantly. No doubt our complex and consuming litigation wringer has assumed the shape it has so courts might squeeze as much truth as possible out of the parties' competing narratives. But sooner or later every case must come to an end. After all, that's why people bring their disputes to court in the first place: because the legal system promises to resolve their differences without resort to violence and supply "peace and repose" at the end of it all. *S. Pac. R.R. Co. v. United States*, 168 U.S. 1, 49 (1897). For a legal system to meet this promise, of course, both sides must accept — or, if need be, they must be made to respect — the judgments it generates. Most people know and readily assent to all this. So it's pretty surprising when a State and several of its counties need a reminder. But that's what this appeal is all about.

4

Nearly forty years ago the Ute Tribe filed a lawsuit alleging that Utah and several local governments were unlawfully trying to displace tribal authority on tribal lands. After a decade of wrangling in the district court and on appeal, this court agreed to hear the case en banc. In the decision that followed, what the parties refer to as *Ute III*, the court ruled for the Tribe and rejected Utah's claim that congressional action had diminished three constituent parts of Ute tribal lands — the Uncompahgre Reservation, the Uintah Valley Reservation, and certain national forest areas. *See Ute Indian Tribe v. Utah*, 773 F.2d 1087, 1093 (10th Cir. 1985) (en banc). When the Supreme Court then denied certiorari, that "should have been the end of the matter." United States' Mem. in Supp. of Ute Indian Tribe's Mot. for Injunctive Relief 3, Supplemental App. 8 (Nov. 23, 1992).

It wasn't. Instead, state officials chose "to disregard the binding effect of the Tenth Circuit decision in order to attempt to relitigate the boundary dispute in a friendlier forum." *Id.* As a vehicle for their effort, they decided to prosecute tribal members in state court for conduct occurring within the tribal boundaries recognized by *Ute III*. This, of course, the State had no business doing. *Ute III* held the land in question to be "Indian country." *See* 773 F.3d at 1093; 18 U.S.C. § 1151 (defining "Indian country"). And within Indian country, generally only the federal government or an Indian tribe may prosecute Indians for criminal offenses. *See DeCoteau v. Dist. County Court*, 420 U.S. 425, 427 & n.2 (1975);

5

*Solem v. Bartlett*, 465 U.S. 463, 465 n.2 (1984). True, states sometimes may prosecute "crimes by non-Indians against non-Indians and victimless crimes by non-Indians." *Bartlett*, 465 U.S. at 465 n.2 (citation omitted). But unless Congress provides an exception to the rule — and it hasn't here — states possess "no authority" to prosecute Indians for offenses in Indian country. *Cheyenne-Arapaho Tribes v. Oklahoma*, 618 F.2d 665, 668 (10th Cir. 1980); 18 U.S.C. § 1162 (allowing certain states but not Utah to exercise jurisdiction over crimes committed by Indians in Indian country).

Disregarding all of this, state officials proceeded with their prosecutions anyway and soon one wended its way to the Utah Supreme Court. Declining to acknowledge or abide "traditional . . . principles of comity, . . . *res judicata* and collateral estoppel," the State argued that the very same congressional actions *Ute III* said did *not* diminish tribal territory *did* diminish at least a part of the Uintah Valley Reservation. United States' Mem., *supra*, at 4, Supplemental App. 9. And with this much at least the Utah Supreme Court eventually agreed. *See State v. Perank*, 858 P.2d 927 (Utah 1992); *State v. Hagen*, 858 P.2d 925 (Utah 1992). Then the United States Supreme Court — despite having denied review in *Ute III* and despite the fact the mandate in that case had long since issued — granted certiorari and agreed too. *See Hagen v. Utah*, 510 U.S. 399, 421-22 (1994).

This strange turn of events raised the question: what to do with the mandate of *Ute III*? Keeping it in place could leave the United States Supreme

6

Court's decision in *Hagen* to control only cases arising from Utah state courts and not federal district courts, a pretty unsavory possibility by anyone's reckoning. So in a decision the parties call *Ute V*, this court elected to recall and modify *Ute III*'s mandate. *See Ute Indian Tribe v. Utah*, 114 F.3d 1513, 1527-28 (10th Cir. 1997). Because *Hagen* addressed the Uintah Valley Reservation, *Ute V* deemed that particular portion of Ute tribal lands diminished — and diminished according to the terms *Hagen* dictated. So much relief was warranted, this court found, to "reconcile two inconsistent boundary determinations and to provide a uniform allocation of jurisdiction among separate sovereigns." *Id.* at 1523.

Naturally, the State wanted more. It asked this court to extend *Hagen*'s reasoning to the national forest and Uncompahgre lands and hold them diminished too. But *Ute V* rejected this request. Upsetting a final decision by recalling and modifying a mandate is and ought to be a rare and disfavored thing in a legal system that values finality. *Id.* at 1527. Though such extraordinary relief might have been warranted to give meaning to *Hagen*'s holding, *Ute V* explained, it wasn't warranted to *extend Hagen*'s reasoning to new terrain — even if doing so might happen to achieve a "more accurate" overall result. *Id.* at 1523. After all, by this point the parties' litigation was so old it had come of age and *Ute III* itself had been settled for years. "If relitigation were permitted whenever it might result in a more accurate determination, in the name of 'justice,' the very values served by preclusion would be quickly destroyed." *Id.* (quoting 18 Charles A.

7

Wright et al., *Federal Practice and Procedure* § 4426, at 265 (1981)).  Following this court's decision in *Ute V*, the Supreme Court again denied certiorari and, really, that should have been the end of it.

But as you might have guessed by now, the State and its counties are back at it.  Just as they did in the 1990s, they are again prosecuting tribal members in state court for offenses occurring on tribal lands — indeed, on the very lands *Ute V* said remain Indian country even after *Hagen*.  Seeking to avoid a replay of the "jurisdictional chaos" the State invited the last time around, United States' Mem., *supra*, at 4, Supplemental App. 9, this time the Tribe filed suit in federal court.  As clarified at oral argument, the Tribe seeks from this suit a permanent injunction prohibiting the State and its counties from pursuing criminal prosecutions of Indians in state court for offenses arising in areas declared by *Ute III* and *V* to be Indian country — and prohibiting the State and its subdivisions from otherwise relitigating matters settled by those decisions.  Toward these ends and as an initial matter, the Tribe asked the district court for a preliminary injunction against the State, Wasatch County, and various officials to halt the prosecution of a tribal member, Lesa Jenkins, in Wasatch County Justice Court for alleged traffic offenses in the national forest area that *Ute III* and *V* recognized as Indian country.  A sort of test case, if you will.  In return, the State and Uintah and Duchesne Counties fired off counterclaims of their own alleging that the Tribe has somehow improperly infringed on *their* sovereignty.

8

Before us now are three interlocutory but immediately appealable collateral orders this latest litigation has spawned. The first addresses the Tribe's request for a preliminary injunction. The latter two address claims of immunity: the Tribe's claim of immunity from the counterclaims and Uintah County's claim of immunity from the Tribe's suit. In all three decisions the district court denied the requested relief. But, as it turns out, the Tribe's arguments on all three points are well taken: the district court should have issued a preliminary injunction and must do so now; the Tribe is shielded by sovereign immunity; and Uintah County is not.

\*

We begin with the Tribe's motion for a preliminary injunction barring the State and Wasatch County from prosecuting Ms. Jenkins in state court. In one sentence and without elaboration, the district court held that the Tribe failed to demonstrate that it would suffer an irreparable harm without an injunction and denied relief on that basis alone.

We cannot agree. The Tenth Circuit has "repeatedly stated that . . . an invasion of tribal sovereignty can constitute irreparable injury." *Wyandotte Nation v. Sebelius*, 443 F.3d 1247, 1255 (10th Cir. 2006). In *Wyandotte Nation* itself, this court upheld a preliminary injunction preventing Kansas from enforcing state gaming laws on a tract of tribal land because of the resulting infringement on tribal sovereignty. *Id.* at 1254-57; *see also Prairie Band of*

9

*Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250-51 (10th Cir. 2001). And we can divine no reason or authority that might justify a different result here, where the invasion of tribal sovereignty is so much greater.

Indeed, the harm to tribal sovereignty in this case is perhaps as serious as any to come our way in a long time. Not only is the prosecution of Ms. Jenkins itself an infringement on tribal sovereignty, but the tortured litigation history that supplies its backdrop strongly suggests it is part of a renewed campaign to undo the tribal boundaries settled by *Ute III* and *V*. Neither do the defendants' briefs offer any reason to hope otherwise. The State supplies just two conclusory paragraphs in defense of the district court's conclusory irreparable injury conclusion. And when it comes to the Tribe's charge that the State is reviving its efforts to undo tribal boundaries, the State simply brushes off the worry as "speculative." But there's nothing speculative about Utah's past disregard of this court's decisions and nothing speculative about the fact Ms. Jenkins's prosecution amounts to the same thing now. For its part, Wasatch County exhibits even less subtlety about its intentions, going so far as to argue that the Tribe may not exercise authority over any lands in Utah because (in part) the State was once "a separate, independent nation, the State of Deseret" with "its own *Constitution*" that didn't recognize Indian lands or tribal authority. Wasatch Appellees' Br. 10-11. Never mind *Ute III* and *V*. And never mind the United States Constitution and the authority *that* document provides the federal government to regulate

10

Indian affairs. On the record before us, there's just no room to debate whether the defendants' conduct "create[s] the prospect of significant interference with [tribal] self-government" that this court has found sufficient to constitute "irreparable injury." *Prairie Band*, 253 F.3d at 1250-51 (second alteration in original) (internal quotation marks omitted). By any fair estimate, that appears to be the whole point and purpose of their actions.

What about the other considerations that traditionally inform preliminary injunction proceedings — the merits, the parties' claimed and competing harms, and the public interest? *See id.* at 1246. The State and County say these elements support them and provide alternative grounds on which we might affirm the district court and deny the Tribe's request for a preliminary injunction. But it turns out the district court didn't rest its decision on these other grounds for good reason.

Take the merits. At the risk of repetition, no one disputes that Ms. Jenkins is an enrolled member of the Tribe, that she is being prosecuted in Utah state court by local officials, or that her alleged offenses took place within the reservation boundaries established in *Ute III* and *V*. As we've seen too, it's long since settled that a state and its subdivisions generally lack authority to prosecute Indians for criminal offenses arising in Indian country. *See supra* at 5-6. To be sure, and as the defendants point out, Ms. Jenkins was stopped and cited for committing a traffic offense on a right-of-way running through Indian lands. But

11

both federal statutory law and *Ute V* expressly hold — and the defendants themselves don't dispute — that "rights-of-way running through [a] reservation" are themselves part of Indian country. 18 U.S.C. § 1151; *Ute V*, 114 F.3d at 1529. Of course, and as the State and County also observe, states may exercise civil jurisdiction over non-Indians for activities on rights-of-way crossing Indian country. *See Strate v. A-1 Contractors*, 520 U.S. 438, 442 (1997). And they may, in certain circumstances, enter Indian lands to investigate off-reservation crimes. *See Nevada v. Hicks*, 533 U.S. 353, 366 (2001). But these observations are beside the point as well, for the preliminary injunction request in this case concerns only the criminal prosecution of Indians in state court for crimes committed in Indian country. In the end, then, the defendants offer no legal authority for their position and face a considerable and uniform body of authority stacked against it. Any consideration of the merits would seem to favor the Tribe — and favor it strongly.

Lacking a viable legal argument the defendants reply with a policy concern. The Tribe's position, they say, would require state officers patrolling rights-of-way to engage in racial profiling because they would have to hazard a guess about whether a driver is or isn't an Indian before pulling her over. But even assuming the relevance of this concern, it is misplaced. After all, officers could just as easily (and lawfully) inquire into a motorist's tribal membership *after* she is stopped for a suspected offense. *See United States v. Patch*, 114 F.3d 131, 133-

12

34 (9th Cir. 1997). Indeed, it seems Utah's law enforcement agencies are *already* doing just that. *See Jones v. Norton*, 3 F. Supp. 3d 1170, 1192 (D. Utah 2014). And, in any event, the Tribe's preliminary injunction request doesn't complain about Ms. Jenkins's *stop*, but seeks only to halt her continued *prosecution* now that the State and County know she's a tribal member.[1]

That brings us to the last two elements of the preliminary injunction test: a comparison of the potential harms that would result with and without the injunction and a consideration of public policy interests. *Prairie Band*, 253 F.3d at 1250. Here again there's no question who has the better of it. On the Tribe's side of the ledger lies what this court has described as the "paramount federal policy" of ensuring that Indians do not suffer interference with their efforts to "develop . . . strong self-government." *Seneca-Cayuga Tribe v. Oklahoma ex rel. Thompson*, 874 F.2d 709, 716 (10th Cir. 1989); *see also Prairie Band*, 253 F.3d at 1253. Against this, the State and Wasatch County argue an injunction would impede their ability to ensure safety on public rights-of-way. But this concern "is not as portentous as [they] would have it." *Prairie Band*, 253 F.3d at 1253. It isn't because nothing in the requested temporary injunction would prevent the

---

[1] Similarly, the State and County raise the possibility that Ms. Jenkins's alleged offenses (driving without an ignition interlock, for example) are "continuing" offenses that might have occurred both on and off tribal lands. But whatever other problems this argument might confront, it fails on its facts. It's undisputed that Ms. Jenkins stands charged in state court for conduct that occurred within tribal lands and no one has pointed to any evidence in the record indicating that any part of the offense continued off-reservation.

13

State and County from patrolling roads like the ones on which Ms. Jenkins was stopped, from stopping motorists suspected of traffic offenses to verify their tribal membership status, from ticketing and prosecuting non-Indians for offenses committed on those roads, from referring suspected offenses by Indians to tribal law enforcement, or from adjudicating disputes over the Indian status of accused traffic offenders when meaningful reasons exist to question that status. Instead, the temporary injunction would simply prohibit the State and County from prosecuting Ms. Jenkins and perhaps other tribal members for offenses in Indian country — something they have no legal entitlement to do in the first place. In this light, the defendants' claims to injury should an injunction issue shrink to all but "the vanishing point." *Seneca-Cayuga*, 874 F.2d at 716.

Though the traditional injunction considerations favor the Tribe, even this doesn't end the matter. Wasatch County (without support from the State) argues that — whatever those considerations might suggest — the Anti-Injunction Act forbids the issuance of any injunction in this case. The County notes, quite rightly, that out of respect for comity and federalism the AIA usually precludes federal courts from enjoining ongoing state court proceedings like Ms. Jenkins's Wasatch County prosecution. 28 U.S.C. § 2283. But this overlooks an important exception to the rule: the AIA also expressly authorizes federal courts to enjoin state proceedings when it's necessary "to protect or effectuate" a previous federal judgment. *Id.* This "relitigation exception," as it's called, allows "a federal court

14

to prevent state litigation of an issue that previously was presented to and decided by the federal court." *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 147 (1988). And that, of course, is exactly what the Tribe asks us to do here. In *Ute III* and *V* this court held that certain national forest lands remain part of the Tribe's reservation — and thus Indian country. *See Ute V*, 114 F.3d at 1528-29; *Ute III*, 773 F.2d at 1089-90. The prosecution of Ms. Jenkins seeks to reopen that judgment and contest whether the same national forest lands, in which her alleged traffic offenses occurred, are Indian country. So relief isn't just called for under traditional preliminary injunction principles, it's statutorily authorized by the AIA. Admittedly, the County tries to suggest that the current prosecution raises at least one "new" issue — whether it possesses the authority to try Indians for crimes on rights-of-way running through tribal lands. But this issue is no new issue at all for, as we've seen, *Ute V* expressly resolved it. *See supra* at 11-12; *Ute V*, 114 F.3d at 1529; 18 U.S.C. § 1151.

Eventually accepting as it must that it really does want to relitigate settled issues, the County replies that it's entitled to do so because it wasn't a party to *Ute III* or *V*. But here we encounter another sort of problem. It's not just parties who are bound by prior decisions: those in privity with them often are too, and counties are usually thought to be in privity with their states for preclusion

15

purposes when the state has lost an earlier suit.[2]  Of course "privity is but a

label," but it is a useful label "convey[ing] the existence of a relationship

sufficient to give courts confidence that the party in the former litigation was an

effective representative of the current party's interests."  *Entek GRB, LLC v. Stull

Ranches, LLC*, 763 F.3d 1252, 1258 (10th Cir. 2014).  Many courts have already

applied these preclusion principles in the AIA context.[3]  And the County offers no

reason to think it should be immune from their force and no reason to think Utah

failed to serve as an effective representative of its interests in *Ute III* and *V*.  In

saying this much we don't mean to exclude the possibility that a county and state

sometimes lack a sufficient identity of interests to warrant the application of

preclusion principles; we mean to suggest only that nobody has given us any

reason to think that possibility is realized here.

Where the County fails with the AIA the State suggests it might succeed

with *Younger v. Harris*, 401 U.S. 37 (1971).  As Utah observes, the AIA isn't the

only legal authority that can induce a federal court to abstain from enjoining

ongoing state court proceedings:  freestanding federalism principles, like those

---

[2]  *See, e.g.*, *County of Boyd v. US Ecology, Inc.*, 48 F.3d 359, 361-62 (8th Cir. 1995); *Nash County Bd. of Ed. v. Biltmore Co.*, 640 F.2d 484, 493-97 (4th Cir. 1981); 18A Charles Alan Wright et al., *Federal Practice and Procedure* § 4458, at 558-59 n.9 (2d ed. 2002) (collecting cases).

[3]  *See, e.g.*, *Vazquez v. Bridgestone/Firestone, Inc.*, 325 F.3d 665, 675-77 (5th Cir. 2003); *First Ala. Bank of Montgomery, N.A. v. Parsons Steel, Inc.*, 825 F.2d 1475, 1486 (11th Cir. 1987); *Kerr-McGee Chem. Corp. v. Hartigan*, 816 F.2d 1177, 1180 (7th Cir. 1987).

16

embodied in *Younger*, often counsel the same course. But for *Younger* abstention to apply, there must be "an ongoing state judicial . . . proceeding, the presence of an important state interest, and an adequate opportunity to raise federal claims in the state proceedings." *Seneca-Cayuga*, 874 F.2d at 711. And the second of these conditions is where Utah falters in this case because, again, it hasn't identified any legitimate state interest advanced by its attempt to relitigate boundary decisions by prosecuting Indians for crimes in Indian country. Indeed, much like the AIA, *Younger* doctrine expressly authorizes federal courts to enjoin the relitigation of settled federal decisions in cases, like ours, of "proven harassment." *Perez v. Ledesma*, 401 U.S. 82, 85 (1971). And even absent a campaign of relitigation, this court in *Seneca-Cayuga* held that where, as here, states seek to enforce state law against Indians in Indian country "[t]he presumption and the reality . . . are that federal law, federal policy, and federal authority are paramount" and the state's interests are insufficient "to warrant *Younger* abstention." 874 F.2d at 713-14. Neither does Utah offer any means by which we might fairly distinguish or disregard the teachings of *Younger*, *Perez*, or *Seneca-Cayuga*.

With all the defendants' efforts to defend the district court's decision on alternative grounds now fully explained and explored they seem to us to have more nearly the opposite of their intended effect. We finish persuaded that all of the traditional preliminary injunction factors favor not the defendants but the

17

Tribe, that the federalism concerns embodied in the AIA and *Younger* do not direct otherwise, and that a remand to the district court with instructions to enter a preliminary injunction is warranted.

*

Only the two questions of sovereign immunity remain for resolution and neither requires so much elaboration. We begin with the Tribe's motion to dismiss the counterclaims brought by Utah and Duchesne and Uintah Counties. It's long since settled that "an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity." *Kiowa Tribe v. Mfg. Techs., Inc.*, 523 U.S. 751, 754 (1998). This principle extends to counterclaims lodged against a plaintiff tribe — even compulsory counterclaims. *Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe*, 498 U.S. 505, 509-10 (1991). And it applies with just as much force to claims or counterclaims brought by states as by anyone else. *See Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2031 (2014). No one before us suggests that Congress has authorized the counterclaims here, so everything turns on whether the Tribe itself has waived its immunity.

The State and Counties argue that the Tribe did just that in three agreements the parties signed in the aftermath of *Ute V*: the Disclaimer, Referral, and Mutual Assistance Agreements, to use the parties' shorthand. But we don't see how that's the case. A tribe's waiver of immunity must be expressed "clearly

18

and unequivocally." *Nanomantube v. Kickapoo Tribe*, 631 F.3d 1150, 1152 (10th Cir. 2011). Yet the Referral Agreement expired by its own terms in 2008 and the Tribe terminated the Disclaimer Agreement in 2011 — well before the defendants brought their counterclaims. Neither do the State and Counties explain how these agreements, even assuming they might once have authorized suit, continue to do so much so long after they've expired. Instead, the defendants leave that possibility to the court's imagination — and that's never a substitute for a clear and unequivocal waiver of immunity.

What about the Mutual Assistance Agreement? Far from waiving immunity, it contains a section entitled "No Waiver of Sovereignty or Jurisdiction Intended." According to that provision, "no acquiescence in or waiver of claims of rights, sovereignty, authority, boundaries, jurisdiction, or other beneficial interests is intended by this Agreement," and "no rights or jurisdiction shall be gained or lost at the expense of the other parties to this Agreement." Yes, the State and Counties point to another section of the agreement that says "[o]riginal jurisdiction to hear and decide any disputes or litigation arising pursuant to or as a result of this Agreement shall be in the United States District Court for the District of Utah." And, yes, this language is similar to language courts have sometimes held sufficient to waive tribal immunity. *See, e.g.*, *C & L Enters., Inc. v. Citizen Band Potawatomi Indian Tribe*, 532 U.S. 411, 415, 418-23 (2001); *Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth.*, 207 F.3d 21,

19

30-31 (1st Cir. 2000). But none of those cases confronted agreements with a separate section expressly asserting sovereign immunity like the one here. And trying to make sense of the whole document before us without rendering any portion of it a nullity — always our aspiration when interpreting contracts — we cannot say it clearly and unequivocally waives sovereign immunity. Instead, the language the defendants cite seems to us best understood as a forum selection clause. *Cf. Santana v. Muscogee (Creek) Nation ex rel. River Spirit Casino*, 508 F. App'x 821, 823 (10th Cir. 2013) (holding that a compact provision "waiv[ing] tribal immunity . . . in a 'court of competent jurisdiction'" did not "alone confer jurisdiction on state courts because states are generally presumed to lack jurisdiction in Indian Country"). So the agreement both refuses to waive sovereign immunity and proceeds to designate the District of Utah as the venue for any disputes should immunity ever be overcome. This arrangement may not seem the most intuitive but it's hardly incongruous: after all, the Tribe is always free to consent to a particular suit arising under the Mutual Assistance Agreement and allow it to proceed in the designated forum even as the Tribe chooses to stand on its claim of immunity in most cases. *See Jicarilla Apache Tribe v. Hodel*, 821 F.2d 537, 539-40 (10th Cir. 1987) (holding that a tribe's potential waiver of immunity in one suit did not waive its immunity in a subsequent suit); *cf. Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675

20

(1999) ("[A] State's sovereign immunity is 'a personal privilege which it may waive at pleasure.'" (quoting *Clark v. Barnard*, 108 U.S. 436, 447 (1883))).

If the agreements don't help their cause, the State and Counties suggest their counterclaims can proceed anyway because they implicate the Tribe's UTERO (or Ute Tribal Employment Rights Office) ordinance. Under the terms of that ordinance, the Tribe has indeed "agree[d] to waive its sovereign immunity." But the ordinance explains that this "waiver is not, and should not be construed as a blanket waiver of the Tribe's sovereign immunity." Instead, the waiver exists "for the sole and limited purpose of enforcement of the terms of [the] Ordinance," which requires employers on the reservation, including the Tribe itself, to "extend a preference to qualified Indians . . . in all aspects of employment." And even assuming without granting that the defendants' counterclaims could somehow be described as an effort to "enforce" the ordinance — itself a seriously questionable notion — the ordinance is enforceable only before tribal courts and the Tribe's UTERO Commission. Nowhere does the waiver permit other parties to hale the Tribe before a nontribal tribunal and this court enjoys no authority to rewrite for the defendants the waiver the Tribe has written for itself. *Seneca-Cayuga*, 874 F.2d at 715 ("[W]aivers of sovereign immunity are strictly construed.").

Having failed to identify any language in a statute, agreement, or other document in which the Tribe has waived its immunity, the State and Counties take us even further afield and in some curious directions. For example, the State and

21

Duchesne County argue we shouldn't dismiss the counterclaims before us because of *Ex parte Young*, 209 U.S. 123 (1908). *Young*, of course, held that claims for prospective injunctive relief against state officials may proceed even though states themselves are generally immune from identical claims. And the Supreme Court has extended *Young*'s application to the tribal context, allowing claims against tribal officials that wouldn't be allowable against the tribe itself. *See Bay Mills*, 134 S. Ct. at 2035. But that principle has no application to this appeal: the counterclaims before us seek relief not from tribal officials but from the Tribe itself, sued in its own name.

The defendants' invocation of the doctrine of equitable recoupment is no more helpful to their cause. Traditionally, this court has treated recoupment as "an equitable defense that applies only to suits for money damages." *Citizen Band Potawatomi Indian Tribe v. Okla. Tax Comm'n*, 888 F.2d 1303, 1305 (10th Cir. 1989), *rev'd in part on other grounds*, 498 U.S. 505.[4] Meanwhile, the defendants' counterclaims in this case seek just injunctive and declaratory relief. And even assuming the doctrine might operate in cases like this, "recoupment is in the nature of a defense" to defeat a plaintiff's claims, not a vehicle for pursuing an affirmative judgment. *Bull v. United States*, 295 U.S. 247, 262 (1935); *see*

---

[4] *See also Bolduc v. Beal Bank, SSB*, 167 F.3d 667, 672 n.4 (1st Cir. 1999); *Black's Law Dictionary* 618 (9th ed. 2009) ("[Equitable recoupment] is ordinarily a defensive remedy going only to mitigation of damages."). *See generally* Thomas W. Waterman, *A Treatise on the Law of Set-Off, Recoupment, and Counter-Claim* ch. 10 (1869).

*also Jicarilla Apache Tribe v. Andrus*, 687 F.2d 1324, 1344 (10th Cir. 1982). Yet an affirmative judgment is exactly what the defendants desire. As clarified at oral argument, the Tribe's suit seeks to bar relitigation of issues settled in *Ute III* and *V* and to enjoin the prosecution of Indians for offenses committed on tribal lands. In reply, the counterclaims ask us to do much more than deny that relief — they demand, among other things, the affirmative relief of an injunction barring the Tribe from bringing lawsuits against county officials in federal or tribal courts.

Along different but no more persuasive lines, Uintah County argues that the Tribe waived its immunity by bringing the original *Ute* litigation some forty years ago. But Supreme Court precedent couldn't be clearer on this point: a tribe's decision to go to court doesn't automatically open it up to counterclaims — even compulsory ones. *See Citizen Band*, 498 U.S. at 509-10. The County contends that an out-of-circuit decision, *Rupp v. Omaha Indian Tribe*, 45 F.3d 1241 (8th Cir. 1995), somehow undermines this principle. But it does no such thing. The tribe in *Rupp* explicitly invited the defendants' counterclaims, "affirmatively . . . asking the defendants to assert any right, title, interest or estate they may have [had] in the disputed lands." *Id.* at 1245. And even Uintah County doesn't suggest it's ever received an invitation like that from the Ute Tribe.

By now the point is plain. The State and Counties haven't identified a clear and unequivocal waiver of sovereign immunity and none of their — often

23

inventive — arguments can substitute for one. The Tribe is entitled to dismissal of the counterclaims.

*

That leaves Uintah County's claim that it's entitled to immunity too. Neither the State nor any of Uintah's sister counties join this argument, and it faces a seriously uphill battle from the start. That's because the Supreme Court "has repeatedly refused to extend sovereign immunity to counties." *N. Ins. Co. of N.Y. v. Chatham County*, 547 U.S. 189, 193 (2006).

Uintah County tries to avoid that conclusion in this case by insisting its county attorneys are the main focus of the Tribe's suit and those officials are entitled to immunity because they are "arms of the state." *See, e.g.*, *Watson v. Univ. of Utah Med. Ctr.*, 75 F.3d 569, 574 (10th Cir. 1996). But even assuming that county attorneys are the proper focus of our attention (the Tribe's suit is against Uintah County, not its attorneys), a problem still persists. For a county official to qualify as an "arm of the state," it's not enough that he "exercise a slice of state power" by carrying out prosecutorial functions. *N. Ins. Co.*, 547 U.S. at 193-94 (quoting *Lake County Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 401 (1979)) (internal quotation marks omitted). Instead, our case law directs us to examine both the "degree of autonomy" that the county official enjoys under state law and the extent to which the finances of his office are "independent of the state treasury." *Watson*, 75 F.3d at 574-75 (quoting

24

*Haldeman v. Wyo. Farm Loan Bd.*, 32 F.3d 469, 473 (10th Cir. 1994)). And both considerations suggest an insufficient connection between Uintah County attorneys and the State of Utah to call them arms of the state. In Utah, county attorneys are elected by county residents alone and the state code refers to them as "elected officers of a county." Utah Code Ann. § 17-53-101; *see also id.* § 17-18a-202. When it comes to finances, county attorneys are paid not from the State's coffers but out of the county's general fund in amounts fixed by county legislative bodies. *Id.* § 17-16-14, -18. Neither has Uintah County pointed to any countervailing features of state law or practice that might favor it and suggest a different result here.

To be clear, we hardly mean to suggest that county attorneys can never qualify as arms of the state. The inquiry turns on an analysis of state law and financial arrangements so the answer may well differ from state to state and agency to agency and epoch to epoch. We can surely imagine a different structure to state law, one in which a county prosecutor's office is a good deal more intimately associated with the state. Indeed, that currently may be the case elsewhere. *See, e.g.*, *Slinger v. New Jersey*, No. 07-CV-5561, 2008 WL 4126181, at *9-10 (D.N.J. Sept. 4, 2008), *rev'd in part on other grounds*, 366 F. App'x 357 (3d Cir. 2010). But there's just no evidence before us suggesting that's currently the case in Utah.

\*

A system of law that places any value on finality — as any system of law worth its salt must — cannot allow intransigent litigants to challenge settled decisions year after year, decade after decade, until they wear everyone else out. Even — or perhaps especially — when those intransigent litigants turn out to be public officials, for surely those charged with enforcing the law should know this much already. Though we are mindful of the importance of comity and cooperative federalism and keenly sensitive to our duty to provide appropriate respect for and deference to state proceedings, we are equally aware of our obligation to defend the law's promise of finality. And the case for finality here is overwhelming. The defendants may fervently believe that *Ute V* drew the wrong boundaries, but that case was resolved nearly twenty years ago, the Supreme Court declined to disturb its judgment, and the time has long since come for the parties to accept it.

The district court's decision denying the preliminary injunction request is reversed and that court is directed to enter appropriate preliminary injunctive relief forthwith. Its decision denying tribal immunity is also reversed and it is instructed to dismiss the counterclaims against the Tribe. The district court's decision denying immunity to Uintah County is affirmed. Before oral argument, we provisionally granted Uintah County's motions for leave to file an amicus brief and supplemental appendix, a decision we do not disturb. All other motions

26

are denied.  Though we see some merit in the Tribe's motion for sanctions against Uintah County given the highly doubtful grounds of some of its arguments to this court, we hope this opinion will send the same message:  that the time has come to respect the peace and repose promised by settled decisions.  In the event our hope proves misplaced and the defendants persist in failing to respect the rulings of *Ute V*, they may expect to meet with sanctions in the district court or in this one.  *See Lonsdale v. United States*, 919 F.2d 1440, 1448 (10th Cir. 1990).