**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| CAREMARK, LLC; CAREMARK PHC, LLC; CAREMARKPCS HEALTH LLC; CAREMARK RX, LLC; AETNA, INC.; AETNA HEALTH, INC., *Petitioners-Appellees*, <br><br> v. <br><br> CHICKASAW NATION; CHICKASAW NATION DEPARTMENT OF HEALTH; ARDMORE HEALTH CLINIC; CHICKASAW NATION MEDICAL CENTER; PURCELL HEALTH CLINIC; TISHOMINGO HEALTH CLINIC; CHICKASAW NATION ONLINE PHARMACY REFILL CENTER, *Respondents-Appellants.* | No. 21-16209 <br><br> D.C. No. 2:21-cv-00574-SPL <br><br><br> OPINION |

Appeal from the United States District Court
for the District of Arizona
Steven Paul Logan, District Judge, Presiding

Argued and Submitted January 11, 2022
Pasadena, California

Before:  J. Clifford Wallace, Danny J. Boggs,[*] and
Michelle T. Friedland, Circuit Judges.

Filed August 9, 2022

Opinion by Judge Friedland

## SUMMARY[**]

### Arbitration

The panel affirmed the district court's order granting the petition of Caremark, LLC, and Caremark affiliates to compel arbitration of a dispute with the Chickasaw Nation and five pharmacies that the Nation owns and operates.

The Chickasaw Nation, a sovereign and federally recognized Indian tribe, operates its own healthcare system, which includes the five pharmacies.  Under federal law, members of federally recognized Native nations are eligible to receive healthcare services at the nations' facilities at no charge, and a nation may recoup the cost of services that it provides to a tribal member from that member's health-insurance plan.  Caremark is the pharmacy benefit manager for health-insurance plans that cover many tribal members served by the Chickasaw Nation's pharmacies.  The Nation signed agreements with Caremark, enrolling its pharmacies

---

[*] The Honorable Danny J. Boggs, United States Circuit Judge for the U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

in Caremark's networks to facilitate reimbursement for the costs of providing pharmacy services to tribal members. Each of these agreements incorporated by reference a Provider Agreement and a Provider Manual. The Provider Manual included an arbitration provision with a delegation clause requiring the arbitrator, rather than the courts, to resolve threshold issues about the scope and enforceability of the arbitration provision.

The Nation sued Caremark in the United States District Court for the Eastern District of Oklahoma, claiming violations of 25 U.S.C. § 1621e, a provision of the Indian Health Care Improvement Act referred to as the "Recovery Act." The Nation alleged that Caremark improperly denied claims for reimbursement for covered medications that its pharmacies provided to tribal members enrolled in Caremark-managed health-insurance plans. Caremark filed a petition to compel arbitration of the Nation's Recovery Act claims. It filed that petition in the United States District Court for the District of Arizona, the forum that the Provider Manual designated for arbitration. The district court granted the petition.

The Nation argued that its Recovery Act claims were not arbitrable for two reasons. First, it argued that it was not bound by the arbitration provision in Caremark's Provider Manual because it never clearly and unequivocally waived its tribal sovereign immunity. Second, it argued that the Recovery Act itself precluded the enforcement of any agreement to arbitrate. Rather than addressing these arguments, the district court sent the threshold arbitrability question to the arbitrator in light of the delegation clause in the Provider Manual.

The panel applied the following principles from Supreme Court case law. First, a court must resolve any challenge that an agreement to arbitrate was never formed, even in the presence of a delegation clause. Next, a court must also resolve any challenge directed specifically to the enforceability of the delegation clause before compelling arbitration of any remaining gateway issues of arbitrability. Finally, if the parties did form an agreement to arbitrate containing an enforceable delegation clause, all arguments going to the scope or enforceability of the arbitration provision are for the arbitrator to decide in the first instance.

The panel rejected the Nation's argument that it did not actually form contracts with Caremark that included arbitration provisions with delegation clauses. The Nation argued that agreeing to arbitration would have waived its tribal immunity, and because the Nation did not take the clear and unequivocal steps necessary to waive immunity, it could not have agreed to the arbitration provisions. The panel concluded that the premise of the Nation's argument—that an arbitration agreement always and necessarily waives tribal sovereign immunity—was incorrect. Rather, the arbitration agreement simply designated a forum for resolving disputes for which immunity was waived.

In the alternative, the Nation contended that arbitration of its claims against Caremark was precluded by the Recovery Act, which states that "no provision of any contract . . . shall prevent or hinder the right of recovery of . . . an Indian tribe[] or organization." The panel concluded that this contention challenged the enforceability of the arbitration provisions as a whole, rather than impugning the validity of the delegation clause specifically, and therefore was for the arbitrator to decide.

The panel affirmed the district court's order compelling arbitration but expressed no opinion on the enforceability of the underlying arbitration provision. The panel did not decide, for example, whether the Nation had waived its sovereign immunity with respect to any counterclaims that Caremark might assert against the Nation in arbitration, or whether the Recovery Act precludes arbitration of the merits of the Nation's claims—leaving those issues to be decided by the arbitrator.

**COUNSEL**

Jonathan Massey (argued) and Matthew M. Collette, Massey & Gail LLP, Washington, D.C.; Michael Burrage, Patricia A. Sawyer, and Reggie N. Whitten, Whitten Burrage, Oklahoma City, Oklahoma; Michael B. Angelovich, Chad E. Ihrig, Bradley W. Beskin, and Nicholas W. Shodrok, Nix Patterson LLP, Austin, Texas; for Respondents-Appellants.

Sarah M. Harris (argued), Kimberly Broecker, and Helen E. White, Williams & Connolly LLP, Washington, D.C.; Jon T. Neumann, Greenberg Traurig LLP, Phoenix, Arizona; Peter J. Kocoras, Thompson Hine LLP, Chicago, Illinois; Brian Steinwascher, Thompson Hine LLP, New York, New York; for Petitioners-Appellees.

John M. Masslon II and Cory L. Andrews, Washington Legal Foundation, Washington, D.C., for Amicus Curiae Washington Legal Foundation.

Mark Emery, Jonathan S. Franklin, and Peter B. Siegal, Norton Rose Fulbright US LLP, Washington, D.C.; Tara S. Morrissey and Jennifer B. Dickey, U.S. Chamber Litigation

Center, Washington, D.C.; for Amicus Curiae Chamber of Commerce of the United States of America.

---

**OPINION**

FRIEDLAND, Circuit Judge:

The Chickasaw Nation and five pharmacies that it owns and operates (collectively, "the Nation") appeal from a district court's order compelling arbitration of the Nation's dispute with Caremark and Caremark affiliates (collectively, "Caremark").  The district court explained that, in light of a clause in the parties' contract delegating to the arbitrator the authority to resolve threshold issues regarding the scope and enforceability of the arbitration provision, the Nation's arguments that its claims are not arbitrable must be resolved by the arbitrator.  We affirm.

**I.**

**A.**

The Chickasaw Nation is a sovereign and federally recognized Indian tribe that operates its own healthcare system, which includes the five pharmacies that are co-appellants in this case.[1]  The Nation's healthcare system serves Native persons throughout Chickasaw territory.  Under federal law, members of federally recognized Native nations are eligible to receive healthcare services at the Nation's facilities at no charge, and the Nation may recoup

---

[1] Those pharmacies are the Ardmore Health Clinic, the Chickasaw Nation Medical Center, the Chickasaw Nation Online Pharmacy Refill Center, the Purcell Health Clinic, and the Tishomingo Health Clinic.

the cost of services that it provides to a tribal member from that member's health-insurance plan.

Caremark is the pharmacy benefit manager ("PBM") for health-insurance plans that cover many tribal members served by the Nation's pharmacies.  As a PBM, Caremark manages prescription drug benefits for health insurers, Medicare Part D drug plans, large employers, and other healthcare payers.  Caremark manages these benefits by enrolling individual pharmacies in "pharmacy networks." By enrolling in a Caremark network, the pharmacies agree to offer preferential pricing to patients enrolled in Caremark-supported health-insurance plans.  Under that business model, the health plans and their member-patients receive lower prices when the patients obtain their prescription drugs from in-network pharmacies.  By enrolling in Caremark networks, the pharmacies avoid the administrative costs of submitting reimbursement claims to each patient's individual insurer.  Instead, an enrolled pharmacy deals only with Caremark, which pays each pharmacy directly for any prescription drugs that it provides to the patients covered by the Caremark-supported insurance plans.

The Nation has signed agreements with Caremark, enrolling its pharmacies in Caremark's networks to facilitate reimbursement for the costs of providing pharmacy services to tribal members.[2]  Like all Caremark pharmacy-network agreements, each of the Nation's agreements with Caremark

---

[2] The Ardmore Health Clinic, the Chickasaw Nation Online Pharmacy, and the Tishomingo Health Clinic enrolled in Caremark networks in 2003.  The Purcell Health Clinic enrolled in 2005.  The Chickasaw Nation Medical Center enrolled in 2010.

includes two key documents: the Provider Agreement and the Provider Manual.

The Provider Agreement is a three-page document setting forth the general terms of the relationship. It contains a section entitled "Entire Agreement" stating that the Provider Manual, among other documents, is "incorporated by this reference as if fully set forth herein." By signing the Provider Agreement, the pharmacy "acknowledges receipt of the Provider Manual."[3]

The Provider Manual is a hundred-plus-page document that governs a pharmacy's relationship with Caremark. The Manual describes, among other things, the services that Caremark-network pharmacies must provide, the claim-submission process, and the terms governing reimbursement. A section entitled "Miscellaneous" includes several subsections governing matters such as assignment of rights, termination of the contract, and the amendment process. It also includes a subsection entitled "Arbitration."

According to the amendment provision, the Provider Manual is updated from time to time, and providers accept amendments to the Manual by receiving the updated version and subsequently submitting to Caremark claims for reimbursement. Caremark amended the Provider Manual eight times between 2004 and 2020. Every version of the Provider Manual has included substantially the same amendment provision.

---

[3] The Provider Agreements for the Chickasaw Nation Medical Center and Purcell Health Clinic are in the record. The other three co-appellant pharmacies' Provider Agreements, which were signed with Caremark's predecessor-in-interest, are not in the record.

The "Arbitration" subsection in every version of the Provider Manual has instructed that all disputes arising in connection with the agreement will be resolved in arbitration. The arbitration provision also includes a "delegation clause"—a clause requiring the arbitrator, rather than courts, to resolve threshold issues about the scope and enforceability of the arbitration provision. A delegation clause appeared in earlier versions of the Provider Manual through incorporation, by reference to the Rules of the American Arbitration Association; after 2014, a delegation clause was expressly set forth in the Provider Manual itself.

Specifically, the pre-2014 versions of the Provider Manual included clauses stating that "[a]ny and all controversies in connection with or arising out of the Provider Agreement . . . will be exclusively settled by arbitration before a single arbitrator in accordance with the Rules of the American Arbitration Association." Since at least 2002, those rules have contained a delegation clause stating that the "arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." *See* Am. Arb. Ass'n, *Commercial Dispute Resolution Procedures (Including Mediation and Arbitration Rules)* R-8 (2002).[4]

Since 2014, the arbitration provision in the Provider Manual, including its express delegation clause, has remained essentially the same. The arbitration provision in the most recent Provider Manual in the record, including the delegation clause (which we underline below), states:

---

[4] For archived versions of these rules, see *Rules, Forms, Fees*, Am. Arb. Ass'n, http://www.adr.org/ArchiveRules.

Any and all disputes between Provider and Caremark [and Caremark's affiliates], including but not limited to, disputes in connection with, arising out of, or relating in any way to, the Provider Agreement or to Provider's participation in one or more Caremark networks . . . will be exclusively settled by arbitration.  This arbitration provision applies to any dispute arising from events that occurred before, on or after the effective date of this Provider Manual. . . .

The arbitrator(s) shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of the agreement to arbitrate, including but not limited to, any claim that all or part of the agreement to arbitrate is void or voidable for any reason.  In the event the arbitrator(s) determine that any provision of this agreement to arbitrate is invalid for any reason, such provision shall be stricken and all remaining provisions will remain in full force and effect.  The arbitrator(s) must follow the rule of Law, and the award of the arbitrator(s) will be final and binding on the parties, and judgment upon such award may be entered in any court having jurisdiction thereof.  Any such arbitration must be conducted in Scottsdale, Arizona and Provider agrees to such jurisdiction, unless otherwise agreed to by the parties in writing.

Since at least 2004, Caremark has sent Provider Manuals to all network pharmacies.  Caremark sent updated Manuals

to all network pharmacies in 2004, 2007, 2009, 2011, 2014, 2016, 2018, and 2020. Since 2014, Caremark has maintained proof of delivery of the Provider Manual to all network pharmacies, including all Chickasaw Nation pharmacies. Between 2014 and 2020, the Nation's pharmacies submitted to Caremark about 1.5 million claims for reimbursement, which collectively exceeded $173 million in value.

**B.**

In December 2020, the Nation sued Caremark in the United States District Court for the Eastern District of Oklahoma, claiming violations of 25 U.S.C. § 1621e, a provision of the Indian Health Care Improvement Act referred to here as the "Recovery Act."

Congress passed the Recovery Act to enable tribal healthcare providers to recover the cost of healthcare services from third-party insurers. Although many Native persons were covered by employer-sponsored or other private health-insurance plans, their insurance contracts often contained coverage exceptions for care provided through the Indian Health Service or at tribal healthcare facilities. Accordingly, the insurers were collecting premiums for insurance coverage for Native individuals whose healthcare costs the insurers were, in reality, reimbursing only rarely. *See* S. Rep. No. 100-508, at 15–16 (1988), *reprinted in* 1988 U.S.C.C.A.N. 6183, 6197–98. To address that problem, Congress created a mechanism whereby "Indian tribes and tribal organizations" could "recover reasonable expenses incurred for the provision of health services to any individual through third party reimbursement." H.R. Rep. No. 102-643, pt. 1, at 75 (1992). The statute allows tribal governments to enforce the statutory "right of recovery" by bringing a civil action to

recoup from any applicable insurer the cost of services provided to tribal members.  *See* 25 U.S.C. § 1621e(a), (e)(1)(B).  The Recovery Act also states that "no provision of any contract . . . or other health care plan or program . . . shall prevent or hinder the right of recovery of . . . an Indian tribe[] or tribal organization."  25 U.S.C. § 1621e(c).

The Nation alleges that, since approximately 2015, Caremark has violated the Recovery Act in several ways. For example, the Nation alleges that Caremark improperly denied claims submitted by the Nation seeking reimbursement for covered medications that its pharmacies provided to tribal members enrolled in Caremark-managed health-insurance plans, and that the Recovery Act entitles the Nation to recover from Caremark the cost of providing those prescription drugs.  The Nation seeks compensatory and punitive damages, attorney's fees, and declaratory and injunctive relief.

A few months after the Nation filed its Complaint, Caremark filed a Petition under the Federal Arbitration Act to compel arbitration of the Nation's Recovery Act claims. Caremark filed that Petition in the United States District Court for the District of Arizona, the forum that the Provider Manual designates for arbitration.

The district court granted the Petition.  The court first explained that "[e]ach of Chickasaw Nation's pharmacies has a current contract with Caremark" and that "[t]hese contracts contain arbitration agreements."  The court then declined to transfer, stay, or dismiss the action based on the Nation's earlier-filed lawsuit in federal court in Oklahoma.[5]

---

[5] The district court explained that "[t]he majority of courts, including the Tenth Circuit in which Oklahoma is located, hold that where the

Finally, the court held that the delegation clause in the Provider Manual was "clear and unmistakable" evidence of the parties' intent to submit the threshold issue of arbitrability to the arbitrator and that, therefore, the "arbitrator must decide whether the claims in this case are subject to arbitration, not [the district court]."

The Nation timely appealed and moved the district court for a stay of its order pending appeal, which the court denied. The Nation sought a stay from our court. In an unexplained order, a motions panel granted a stay pending appeal and ordered expedited briefing.

## II.

We review de novo a district court's decision to grant or deny a petition to compel arbitration. *Bushley v. Credit Suisse First Bos.*, 360 F.3d 1149, 1152 (9th Cir. 2004). We review for clear error any factual findings underlying the district court's order. *O'Connor v. Uber Techs., Inc.*, 904 F.3d 1087, 1093 (9th Cir. 2018).

## III.

The Nation advances two reasons why its Recovery Act claims are not arbitrable. First, the Nation argues that it is not bound by the arbitration provision in Caremark's Provider Manual because it never clearly and unequivocally

---

parties have agreed to arbitrate in a particular forum, *only* a district court in that forum has the authority to compel arbitration under § 4 of the [Federal Arbitration Act]." (quotation marks omitted). The court reasoned that, if it were to "defer to the Oklahoma court on the arbitration issue, and the Oklahoma court were to find that the claims in this case were subject to arbitration, the Oklahoma court could not enforce the agreement and compel arbitration."

waived its tribal sovereign immunity.  Second, and in the alternative, the Nation argues that the Recovery Act itself precludes the enforcement of any agreement to arbitrate in this context.

The primary issue raised by this appeal, however, is who should decide whether the Nation's claims are arbitrable—the arbitrator or the court.  The district court sent the threshold arbitrability question to the arbitrator in light of the delegation clause in the Provider Manual.  The Nation argues that the district court erred by refusing to decide for itself the threshold issue of arbitrability.

**A.**

We briefly explain the background legal principles that guide our analysis.  To start, Section 2 of the Federal Arbitration Act ("FAA") provides:

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.  Section 4 of the FAA further provides that a party may petition to compel arbitration in federal district court, and the court "shall make an order directing the parties to proceed to arbitration" "upon being satisfied that the making of the agreement for arbitration . . . is not in issue." 9 U.S.C. § 4.

The Supreme Court has interpreted that statutory language to cabin a court's authority to adjudicate challenges

to contracts governed by the FAA that contain arbitration provisions.  In general, courts may resolve challenges directed specifically to the validity of the arbitration provision itself.  *See Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445–46 (2006).  If there is no such challenge—or if such a challenge fails—the court must send to the arbitrator any other challenges, including challenges to the validity of the contract as a whole.  *Id.*  For instance, in the presence of an otherwise-valid arbitration provision, a challenge that "the [entire] agreement was fraudulently induced" or "that the illegality of one of the contract's provisions renders the whole contract invalid" must be sent to the arbitrator.  *Id.* at 444–46 (enforcing an arbitration clause despite a challenge that the contract as a whole was void for illegality under state law); *see also Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 402–04 (1967) (enforcing an arbitration clause despite a challenge that the contract as a whole was fraudulently induced).

The presence of a delegation clause further limits the issues that a court may decide.  A delegation clause is a clause within an arbitration provision that delegates to the arbitrator gateway questions of arbitrability, such as whether the agreement covers a particular controversy or whether the arbitration provision is enforceable at all.  *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010).  The FAA "allows parties to agree by contract that an arbitrator, rather than a court, will resolve threshold arbitrability questions as well as underlying merits disputes."  *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 527 (2019).  But the Supreme Court has "added [the] important qualification" that there must be "clear and unmistakable" evidence that "the parties agreed to arbitrate arbitrability."  *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (alterations and quotation marks omitted).  The Court has held that "[a]n

agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce." *Rent-A-Center*, 561 U.S. at 70. In other words, a delegation clause is essentially a mini-arbitration agreement, nested within a larger one. "[T]he FAA operates on this additional arbitration agreement just as it does on any other." *Id.*

The Court has treated delegation clauses within arbitration provisions the same way it treats arbitration provisions within broader contracts. In *Rent-A-Center*, the Court held that a challenge to the validity of an entire arbitration agreement—there, an unconscionability challenge—must be decided by the arbitrator if the agreement includes a delegation clause that is not directly challenged. *Id.* at 70–72. The Court emphasized that a party must "challenge[] the delegation provision specifically" for a court to intervene. *Id.* at 71–72. Under *Rent-A-Center*, then, a valid—*i.e.*, enforceable[6]—delegation clause commits to the arbitrator nearly all challenges to an arbitration provision.

But in *Granite Rock Company v. International Brotherhood of Teamsters*, 561 U.S. 287 (2010)—decided just three days after *Rent-A-Center*—the Supreme Court clarified that contract-*formation* issues are always matters for judicial resolution. *Granite Rock* explained that the issues reserved to the courts for decision "always include" whether an arbitration agreement was formed, even in the presence of a delegation clause. *Id.* at 297; *see id.* at 299. That principle follows from the fundamental premise that

---

[6] *See Rent-A-Center*, 561 U.S. at 69 n.1 (stating that the issue of an agreement's "validity" concerns "whether it is legally binding" (emphasis omitted)).

arbitration is "strictly 'a matter of consent.'"  *Id.* at 299 (quoting *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989)).  "To take the question of contract formation away from the courts would essentially force parties into arbitration when the parties dispute whether they ever consented to arbitrate anything in the first place." *Dr.'s Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 251 (2d Cir. 2019).  And preserving for the courts the contract-formation question comports with the requirement in section 4 of the FAA that courts enforce arbitration agreements only "upon being satisfied that the making of the agreement for arbitration . . . is not in issue." 9 U.S.C. § 4.  Accordingly, a court "should order arbitration of a dispute only where the court is satisfied that neither the formation of the parties' arbitration agreement *nor* (absent a valid provision specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute is in issue."[7]  *Granite Rock*, 561 U.S. at 299.

The following principles emerge from the above line of cases.  First, a court must resolve any challenge that an agreement to arbitrate was never formed, even in the

---

[7] To the extent that there may have been any lingering ambiguity after *Granite Rock*, numerous courts of appeals have since held that contract formation is *always* an issue for the court, notwithstanding the presence of a delegation clause.  *Dr.'s Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 251 (2d Cir. 2019); *Rowland v. Sandy Morris Fin. & Est. Plan. Servs., LLC*, 993 F.3d 253, 258 (4th Cir. 2021); *Edwards v. Doordash, Inc.*, 888 F.3d 738, 744 (5th Cir. 2018); *Fedor v. United Healthcare, Inc.*, 976 F.3d 1100, 1105–06 (10th Cir. 2020).  Our cases decided before *Granite Rock* are in accord.  *See Textile Unlimited, Inc. v. A..BMH & Co., Inc.*, 240 F.3d 781, 786 (9th Cir. 2001); *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1140–41 (9th Cir. 1991).

presence of a delegation clause. Next, a court must also resolve any challenge directed specifically to the enforceability of the delegation clause before compelling arbitration of any remaining gateway issues of arbitrability. Finally, if the parties did form an agreement to arbitrate containing an enforceable delegation clause, all arguments going to the scope or enforceability of the arbitration provision are for the arbitrator to decide in the first instance. We next apply these principles to the Nation's two arguments challenging the arbitrability of its Recovery Act claims.

## B.

We first address the Nation's argument that it did not actually form contracts with Caremark that included arbitration provisions with delegation clauses. The Nation argues that agreeing to arbitration would have waived its tribal immunity, and because the Nation did not take the clear and unequivocal steps necessary to waive immunity, it cannot have agreed to the arbitration provisions. We reject that argument.

The Nation does not seriously dispute that its pharmacies have contractual relationships with Caremark that are governed by the terms of the Provider Manual. The Nation acknowledges that all its pharmacies signed Provider Agreements with Caremark or with Caremark's predecessors-in-interest governing reimbursement of claims for pharmacy services. Again, the Provider Agreements state that the Provider Manuals are "incorporated [in the

Provider Agreements] by this reference as if fully set forth herein."[8]

As explained above, every version of the Provider Manual has included an arbitration provision delegating gateway questions of arbitrability to the arbitrator. The pre-2014 Manuals did so by incorporating the Rules of the American Arbitration Association, which contain a delegation clause. We have held that "incorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015). Since 2014, the Provider Manuals have expressly stated that the arbitrator "shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, [or] enforceability . . . of the agreement to arbitrate."

Given that history—and considering the hundreds of thousands of claims the Nation has submitted to Caremark

---

[8] The Provider Agreements signed by Ardmore Health Clinic, Tishomingo Health Clinic, and the Chickasaw Nation Online Pharmacy Refill Center are not in the record. *See supra* note 3. Caremark has submitted a declaration stating that, because its agreements use consistent language, those pharmacies' Provider Agreements "would have contained the same language" as the Agreements signed by the Chickasaw Nation Health Center and Purcell Health Clinic purporting to incorporate the Provider Manual by reference as part of the entire agreement. The record also contains a 2005 Addendum to the Provider Agreement signed by the Tishomingo Health Clinic confirming that "the terms" of the original Provider Agreement "includ[e] the Provider Manual." In concluding that the Nation's pharmacies have current contracts with Caremark that include the terms in the Provider Manuals, the district court implicitly credited the assertion in Caremark's declaration that all the Provider Agreements signed by those pharmacies included the "incorporated by this reference" language and that the pharmacies received the Provider Manuals. The Nation has not shown that those factual findings are clearly erroneous.

over the last several years—the Nation cannot plausibly deny that it formed contracts with Caremark. And the language of those contracts includes arbitration provisions with delegation clauses.[9]

The Nation does not disavow the contracts entirely. Instead, it asks us to "excise" the arbitration provisions while leaving the remainder of the parties' agreements intact. The Nation argues that, because arbitration provisions are severable from the contracts in which they appear as a matter of substantive federal arbitration law, we may consider separately (1) whether the parties agreed to the arbitration provisions, and (2) whether the parties agreed to the other obligations in the Provider Agreement (including the Provider Manual). The Nation suggests that we must apply a different standard in answering each of those two questions, requiring a special, heightened showing to conclude, in answering the first question, that the Nation entered into an arbitration agreement. The Nation grounds its argument in sovereign-immunity principles: It argues that, because an arbitration agreement would waive its sovereign immunity, we must infer, absent clear and unequivocal evidence to the contrary, that the Nation did not agree to arbitration.

---

[9] The Nation challenges the amendment process laid out in the Provider Manual to argue that the most recent arbitration provision—the one contained in the Provider Manuals since 2014—does not govern this case. We need not reach that issue because, as we stated above, every version of the Provider Manual since the Nation's pharmacies first signed Provider Agreements has delegated gateway issues of arbitrability to the arbitrator. Accordingly, even if the Nation were correct about a flaw in the amendment procedure, our analysis of whether the district court was correct to send gateway issues to the arbitrator would not change.

The Nation is correct that any waiver of its sovereign immunity must be expressed in clear and unequivocal terms. *C & L Enters., Inc. v. Citizen Band Potawatomi Indian Tribe of Okla.*, 532 U.S. 411, 417–18 (2001); *see also Ute Indian Tribe of the Uintah & Ouray Rsrv. v. Utah*, 790 F.3d 1000, 1009 (10th Cir. 2015) (Gorsuch, J.).  That proposition is beyond dispute, but it is also beside the point.  The premise of the Nation's argument—that an arbitration agreement always and necessarily waives tribal sovereign immunity—is incorrect, so its argument falls apart at the threshold.[10]

An arbitration agreement may or may not have implications for a tribe's sovereign immunity, and courts need not resolve the sovereign-immunity implications (if any) before deciding whether an agreement to arbitrate exists at all.  The Tenth Circuit's decision in *Ute Indian Tribe* helpfully explains how a forum-selection clause—which, like an arbitration provision, is an agreement to bring any disputes to a particular forum—does not necessarily waive

---

[10] The Nation is correct that—at least in the absence of a delegation clause in an arbitration agreement and a non-severability clause in the contract containing that agreement—the court might be able to sever an invalid arbitration provision from the contract and enforce the remainder of the parties' agreement.  *See, e.g.*, *Graham Oil Co. v. ARCO Prods. Co.*, 43 F.3d 1244, 1248–49 (9th Cir. 1994) (holding an arbitration clause invalid and striking the clause from the contract, where "neither party suggest[ed] that if the arbitration clause is unlawful, the entire contract must be invalidated").  The fact that the arbitration provision might be severable from the contract if the provision is ultimately found to be unenforceable, however, does not support the Nation's argument that we should conduct a separate and more stringent contract-formation inquiry in deciding whether the Nation agreed to the arbitration provision in the first place.  Moreover, in the presence of a valid delegation clause, the arbitrator—and not the court—would have to determine whether an arbitration provision is enforceable and, if not, whether it can be severed from the remainder of the contract.  *See Rent-A-Center*, 561 U.S. at 71.

sovereign immunity; rather, the forum-selection clause may simply designate a forum for resolving disputes for which immunity *is* waived. *See* 790 F.3d at 1010. In that case, the tribe had agreed that "[o]riginal jurisdiction to hear and decide any disputes or litigation" under the contract "shall be in the United States District Court for the District of Utah." *Id.* at 1009 (alteration in original). The court declined to find an immunity waiver because a different provision of the contract stated that "no acquiescence in or waiver of claims of rights, sovereignty, authority, boundaries, jurisdiction, or other beneficial interests is intended by this Agreement." *Id.* at 1009–10. The court concluded that the tribe had agreed to proceed in the designated forum for any dispute for which it waived tribal immunity, but that it had reserved its right to stand on its claim of immunity on a case-by-case basis. *Id.* at 1010.

As *Ute Indian Tribe* illustrates, the Nation's assumption that a tribe's entering an arbitration agreement will necessarily waive tribal immunity is unfounded—a tribal organization might agree to arbitrate any disputes for which it has waived sovereign immunity but still reserve its ability to choose whether to waive immunity in any given case. The Nation's proposed approach here would put the cart before the horse, requiring us to resolve whether there has been a waiver of tribal immunity for particular claims for which arbitration is sought before determining whether an arbitration agreement exists at all.

Accordingly, we reject the Nation's argument that, because it did not clearly and unequivocally waive its tribal

immunity, it cannot have agreed to the arbitration provisions (or the delegation clauses) in the Provider Manuals.[11]

## C.

In the alternative, the Nation contends that the Recovery Act precludes arbitration of its claims against Caremark. The Nation relies primarily on language in the Recovery Act stating that "no provision of any contract . . . shall prevent or hinder the right of recovery of . . . an Indian tribe[] or tribal organization."  25 U.S.C. § 1621e(c).  The Nation argues that the arbitration procedures specified in the Provider Manual "prevent or hinder" the Nation's right of recovery in violation of § 1621e(c)—and that the arbitration provision is therefore unenforceable, as applied to the Nation's claims. The Nation points, for example, to the arbitration agreement's specification of a statute-of-limitations period shorter than that in the Recovery Act.  The Nation also argues that the Recovery Act's language permitting the tribe to "institut[e] a separate civil action," 25 U.S.C.

---

[11] A couple of sentences in the Nation's reply brief could be read to suggest that, even if valid arbitration agreements with valid delegation clauses exist, the Nation's sovereign immunity bars Caremark from initiating a proceeding against the Nation in the Arizona district court to compel arbitration.  That issue was not "argued specifically and distinctly in [the] opening brief," nor adequately developed in the reply brief, so we decline to address it here. *Christian Legal Soc'y Chapter of Univ. of Cal. v. Wu*, 626 F.3d 483, 485 (9th Cir. 2010) (quoting *Brownfield v. City of Yakima*, 612 F.3d 1140, 1149 n.4 (9th Cir. 2010)); *see United States v. Kimble*, 107 F.3d 712, 715 n.2 (9th Cir. 1997) (declining to address an argument that "was not coherently developed in [the] briefs on appeal").

§ 1621e(e)(1)(B), gives the Nation the remedy of an action in federal court, not arbitration.[12]

The Nation's theory that the Recovery Act displaces the arbitration provisions in the Provider Manuals does not impugn the validity of the delegation clauses specifically. Instead, like the unconscionability claim in *Rent-A-Center*, it is a challenge to the enforceability of the arbitration provisions as a whole.  *Rent-A-Center*, 561 U.S. at 72; *accord Brennan*, 796 F.3d at 1133 (holding that the plaintiff's unconscionability claim was for the arbitrator to decide because the plaintiff "failed to make any arguments specific to the delegation provision and instead argued that the [arbitration provision] *as a whole* [was] unconscionable" (quotation marks and citation omitted)).  Accordingly, the district court was correct to "treat [the delegation clause] as valid under [FAA] § 2" and "enforce it under §§ 3 and 4, leaving any challenge to the validity of the [arbitration agreement] as a whole for the arbitrator."  *Rent-A-Center*, 561 U.S. at 72.

The Nation responds that, under *New Prime Inc. v. Oliveira*, 139 S. Ct. 532 (2019), a delegation clause can never prevent a court from determining whether a statute precludes arbitration.  We disagree.  In *New Prime*, the Supreme Court held that a district court must determine for itself whether a contract is covered by the FAA before asserting its authority under that statute to enforce an arbitration provision.  *Id.* at 537–38.  That is because, if a contract falls within an FAA-exempt category, the district

---

[12] In its opening brief, the Nation also appeared to argue that the arbitration provision is an invalid prospective waiver of the Nation's right to pursue its Recovery Act claims.  The Nation disclaimed that argument in its reply brief, so we do not address it here.

court has no power at all to compel arbitration—including to compel arbitration of gateway issues pursuant to a delegation clause. *See id.* By contrast, the Nation's argument here does not call into question the district court's authority to enforce the *delegation clause*—rather, it challenges the enforceability of the arbitration provision as a whole, on the ground that the Nation's claims are not arbitrable because the procedural rules in arbitration "prevent or hinder" the Nation's right of recovery under § 1621e(c). That challenge raises exactly the type of threshold arbitrability issue that the parties have delegated to the arbitrator, and the district court was therefore correct not to decide it.[13]

---

[13] In its reply brief, the Nation notes that the procedures specified in the arbitration agreement "become effective at the moment of delegation and hamstring the Nation's ability to arbitrate the threshold issues themselves." Those procedures include the arbitration agreement's prescription of a shorter statute-of-limitations period, less generous fee- and cost-shifting provisions (including a requirement that the party initiating the arbitration deposit funds in escrow to cover the expected costs of arbitrating), limitations on discovery and available damages, and confidentiality provisions. To the extent that this argument specifically challenges the enforceability of the delegation clause, we reject it. Most of the challenged arbitration procedures do not implicate at all the Nation's ability to arbitrate the delegated gateway issues. The statute-of-limitations and damages provisions are immaterial at this stage, and the Nation has not explained why it would need discovery to arbitrate the legal question whether the Recovery Act displaces the arbitration provision. Nor has the Nation explained how the confidentiality provisions would hamper its ability to arbitrate that question. Finally, even if the delegation clause requires the Nation to deposit funds in escrow before arbitrating the gateway issues, that requirement does not impose a barrier sufficient to render the delegation clause unenforceable. The Nation can recover that deposit and recover attorney's fees from Caremark if the Nation prevails on its argument that its Recovery Act claims are not arbitrable. The Nation has not raised any other challenges directed specifically to the validity of the delegation clause.

## IV.

For the foregoing reasons, we affirm the judgment of the district court compelling arbitration. We express no opinion on the enforceability of the underlying arbitration provision, which—in light of the delegation clause—is an issue that the arbitrator must decide in the first instance. We do not decide, for example, whether the Nation has waived its sovereign immunity with respect to any counterclaims that Caremark might assert against the Nation in arbitration, or whether the Recovery Act precludes arbitration of the merits of the Nation's claims.