**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CAREMARK, LLC; CAREMARK
PHC, LLC; CAREMARKPCS
HEALTH LLC; CAREMARK RX
LLC; AETNA, INC.; AETNA
HEALTH, INC.,
　　　　　　*Plaintiffs-Appellees*,

　v.

CHOCTAW NATION; CHOCTAW
NATION HEALTH SERVICES
AUTHORITY; CHOCTAW HEALTH
CARE, TALIHINA, OK; CHOCTAW
NATION HEALTH CLINIC-RUBIN
WHITE, POTEAU; CHOCTAW
NATION HEALTH CLINIC-
MCALESTER; CHOCTAW NATION
HEALTH CLINIC-IDABEL;
CHOCTAW NATION HEALTH
CLINIC-STIGLER; CHOCTAW
NATION HEALTH CLINIC-HUGO;
CHOCTAW NATION HEALTH
CLINIC-ATOKA; CHOCTAW
NATION HEALTH CARE CENTER
DURANT PHARMACY; CHOCTAW
NATION ONLINE PHARMACY
REFILL CENTER,
　　　　　　*Defendants-Appellants*.

No.22-15543

D.C. No.
2:21-cv-01554-
SMB

OPINION

Appeal from the United States District Court
for the District of Arizona
Susan M. Brnovich, District Judge, Presiding

Argued and Submitted October 18, 2023
Phoenix, Arizona

Filed June 10, 2024

Before:  Sandra S. Ikuta, Bridget S. Bade, and Daniel A.
Bress, Circuit Judges.

Opinion by Judge Bade

## SUMMARY[*]

### Arbitration

The panel affirmed the district court's order granting the petition of Caremark, LLC, and its affiliates to compel arbitration of claims brought under the Recovery Act, 25 U.S.C. § 1621e, a provision of the Indian Health Care Improvement Act, by the Choctaw Nation and several pharmacies that it owns and operates.

The Nation and Caremark entered agreements to facilitate insurance reimbursements for the Nation's costs for pharmacy services for its members. The Nation filed suit in the Eastern District of Oklahoma, alleging that Caremark,

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

as the insurers' pharmacy benefit manager, unlawfully denied pharmacy reimbursement claims in violation of the Recovery Act. After the matter was stayed in the Eastern District of Oklahoma, Caremark petitioned under the Federal Arbitration Act to compel arbitration of the Nation's claims in the District of Arizona. The district court granted the petition, concluding that the parties' agreements included arbitration provisions with delegation clauses and therefore an arbitrator must decide the Nation's arguments that its claims are not arbitrable.

The panel held that most of the Nation's arguments challenging the district court's arbitration order were foreclosed by *Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021 (9th Cir. 2022), which addressed the enforceability of identical arbitration provisions. In *Chickasaw*, the court held that the Chickasaw Nation formed contracts with Caremark, and those contracts included arbitration provisions with delegation clauses. Therefore, the question whether there had been a waiver of tribal sovereign immunity was an enforceability question delegated to the arbitrator. The court also rejected the Chickasaw Nation's argument that its claims were not arbitrable because the Recovery Act itself precludes the enforcement of any agreement to arbitrate. The court held that a challenge to arbitration on the ground that a statute precludes arbitration is a threshold arbitrability issue delegated to the arbitrator in the first instance.

The panel held that the Nation's remaining argument that the District of Arizona lacked subject-matter jurisdiction over the petition to compel arbitration failed because the Nation contractually agreed to arbitrate its claims against Caremark in Arizona, and in those contracts specifically "agree[d] to such jurisdiction." Thus, the Nation expressly

waived its tribal sovereign immunity as a bar to arbitration in the District of Arizona.

## COUNSEL

Sarah M. Harris (argued), Kimberly Broecker, and Libby Baird, Williams and Connolly LLP, Washington, D.C.; Jon T. Neuman, Greenberg Traurig LLP, Phoenix, Arizona; Peter J. Kocoras, Thompson Hine LLP, Chicago, Illinois; for Plaintiffs-Appellees.

Jessica Underwood (argued), Michael B. Angelovich, Chad E. Ihrig, Bradley W. Beskin, and Nicholas W. Shodrok, Nix Patterson LLP, Austin, Texas; Michael Burrage, Patricia A. Sawyer, and Reggie N. Whitten, Whitten Burrage, Oklahoma City, Oklahoma; for Defendants-Appellants.

## OPINION

BADE, Circuit Judge:

The Choctaw Nation and several pharmacies that it owns and operates (collectively, the Nation or the Choctaw Nation) appeal from a district court order compelling arbitration of the Nation's dispute with Caremark, LLC, and its affiliates (collectively, Caremark). Over several years, the Nation and Caremark entered agreements to facilitate insurance reimbursements for the Nation's costs for pharmacy services for its members. This dispute began when the Nation filed suit in the Eastern District of Oklahoma alleging that Caremark, as the insurers' pharmacy benefit manager, unlawfully denied pharmacy

reimbursement claims in violation of the Recovery Act, 25 U.S.C. § 1621e, a provision of the Indian Health Care Improvement Act. After the matter was stayed in the Eastern District of Oklahoma, Caremark petitioned to compel arbitration of the Nation's claims in the District of Arizona. The district court granted the petition, concluding that the parties' agreements included arbitration provisions with delegation clauses and therefore an arbitrator must decide the Nation's arguments that its claims are not arbitrable.

In this appeal, most of the Choctaw Nation's arguments challenging the district court's arbitration order are foreclosed by our decision in *Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021 (9th Cir. 2022). The Nation's main remaining argument that the District of Arizona lacked subject-matter jurisdiction over the petition to compel arbitration fails because the Nation contractually agreed to arbitrate its claims against Caremark in Arizona, and in those contracts specifically "agree[d] to such jurisdiction." Thus, the Nation expressly waived its tribal sovereign immunity as a bar to arbitration in the District of Arizona, and the district court had subject-matter jurisdiction to decide the motion to compel arbitration. We affirm.

## I.

## A.

The Choctaw Nation is a sovereign and federally recognized Native American tribal nation headquartered in Oklahoma. The Choctaw Nation owns and operates healthcare facilities, including pharmacies, that serve Choctaw citizens and other Native persons throughout the Choctaw region. Caremark provides pharmacy benefit management services to insurers, third-party administrators, and employer sponsors of group health plans. These services

include the administration and maintenance of pharmacy provider networks.  The Choctaw Nation's pharmacies are participants in various pharmacy networks administered by Caremark.

As participants in Caremark's pharmacy networks, the Choctaw Nation's pharmacies signed Provider Agreements with Caremark (or its predecessor) in 2003, 2005, 2008, and 2010.  Each Provider Agreement incorporates by reference a Provider Manual, which governs each pharmacy's relationship with Caremark.[1]  The Provider Manuals, which Caremark issued and sent to the pharmacies in 2004, 2007, 2009, 2011, 2014, 2016, 2018, and 2020, each contain an arbitration provision.  The arbitration provision provides,

> Any and all disputes between Provider and Caremark . . . including but not limited to, disputes in connection with, arising out of, or relating in any way to, the Provider Agreement or to Provider's participation in one or more Caremark networks or exclusion from any Caremark networks, will be exclusively settled by arbitration.

The arbitration provision further provides that "the arbitration shall be administered by the American Arbitration Association (AAA) pursuant to the then applicable AAA Commercial Arbitration Rules and Mediation Procedures."  And it provides that "[t]his

---

[1] The Choctaw Nation and its pharmacies are "Providers" under the Provider Agreements and Provider Manuals.  The Provider Agreements and incorporated Provider Manuals here are identical to those at issue in *Chickasaw*.

arbitration agreement . . . shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1–16."

The arbitration provision also includes a delegation clause, in which the parties agreed,

> The arbitrator(s) shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of the agreement to arbitrate, including but not limited to, any claim that all or part of the agreement to arbitrate is void or voidable for any reason.

The arbitration provision provides that the arbitrator's award "will be final and binding on the parties, and judgment upon such award may be entered in any court having jurisdiction thereof." Finally, the arbitration provision provides that any arbitration "must be conducted in Scottsdale, Arizona and Provider agrees to such jurisdiction, unless otherwise agreed to by the parties in writing."

## B.

Under federal law, a member of a tribal nation, including the Choctaw Nation, may obtain prescription medication that is fully funded by that nation. *See Chickasaw*, 43 F.4th at 1025. The tribal nation receives federal funding for these medication costs through Indian Health Services, an agency within the Department of Health and Human Services that provides medical services and funding to federally recognized Native American tribal nations. *See* 25 U.S.C. § 1621 et seq. In addition to federally funded healthcare, many tribal members have private insurance coverage, often through the member's employee benefits. *Chickasaw*,

43 F.4th at 1027.  When tribal members have such dual coverage, private insurers have primary payment responsibility, and the Recovery Act provides that the tribal nation is the "payer of last resort."  25 U.S.C. § 1623(b).

In these circumstances, when the Nation's pharmacies fill prescriptions for the tribal members, the pharmacies may seek recovery of these costs from private insurers under the Recovery Act.  *See Chickasaw*, 43 F.4th at 1027 (explaining that the Recovery Act enables "tribal governments to enforce the statutory 'right of recovery' by bringing a civil action to recoup from any applicable insurer the cost of services provided to tribal members" (citing 25 U.S.C. § 1621e(a), (e)(1)(B))).  The Recovery Act further provides that "no provision of any contract, insurance or health maintenance organization policy, employee benefit plan, self-insurance plan, managed care plan, or other health care plan or program . . . shall prevent or hinder the right of recovery of the United States, an Indian tribe, or tribal organization." 25 U.S.C. § 1621e(c).

In April 2021, the Choctaw Nation sued Caremark in the Eastern District of Oklahoma for reimbursement of healthcare costs under the Recovery Act.  *See Choctaw Nation v. Caremark PHC, LLC*, No. 6:21-cv-00128 (E.D. Okla. Apr. 26, 2021), ECF 1.  In its complaint, the Choctaw Nation alleged that Caremark violated the Recovery Act by improperly denying claims for covered medications that the Nation had submitted on behalf of tribal members. Caremark, in response, moved to stay the proceedings in the Eastern District of Oklahoma based on the arbitration provisions in the Provider Manuals, which require disputes to "be exclusively settled by arbitration . . . in Scottsdale, Arizona."  The district court granted the motion and stayed the proceedings.

Caremark then filed a petition to compel arbitration under the Federal Arbitration Act (FAA) in the District of Arizona.  Caremark argued that the terms of the Provider Manuals required the Choctaw Nation to arbitrate its reimbursement claims.  The Choctaw Nation opposed the petition.   The Nation argued that it had not signed agreements that clearly and unequivocally waived its sovereign immunity to allow arbitration of its Recovery Act claims against Caremark, and that it did not waive its immunity to arbitration proceedings in the District of Arizona by filing suit in the Eastern District of Oklahoma. The Nation also argued that the Recovery Act displaces the arbitration provisions in the Provider Manuals, rendering those agreements to arbitrate unenforceable.

The district court granted the petition and compelled the parties to arbitrate under § 4 of the FAA.  The district court first found that, under the Provider Agreements, the Choctaw Nation had agreed to the terms of the incorporated Provider Manuals, including the arbitration provisions.  The district court also found that the arbitration provisions included "clear and unmistakable" delegation clauses, which required an arbitrator—not the district court—to "decide the threshold question of arbitrability."  Given those findings, the district court concluded that "the Nation has waived its sovereign immunity for claims brought related to the Provider Agreement[s]."  And finally, the district court determined that whether the Recovery Act displaces the arbitration provisions is a threshold arbitrability question for the arbitrator to decide.  The Choctaw Nation timely appealed.

C.

In this appeal, the Choctaw Nation first argues that its claims are not arbitrable by asserting the same arguments that we rejected in *Chickasaw*.**[2]**  Specifically, the Choctaw Nation, like the Chickasaw Nation before it, acknowledges that it entered Provider Agreements with Caremark, but argues that (1) the Provider Agreements, as opposed to the Provider Manuals they incorporate by reference, do not contain arbitration provisions with delegation clauses, (2) the Nation could not have clearly and unequivocally waived its sovereign immunity for arbitration proceedings by entering these agreements because the tribal representatives who signed the contracts on its behalf were not authorized to waive immunity, and (3) even if the Nation entered valid arbitration agreements, the Recovery Act precludes the enforcement of any agreement to arbitrate.

Because *Chickasaw* is binding precedent that rejected these arguments challenging the enforceability of identical arbitration provisions, *see* 43 F.4th at 1030–34, we must follow it and likewise reject these arguments.  *See Miller v. Gammie*, 335 F.3d 889, 899–900 (9th Cir. 2003) (en banc) (explaining that "a three-judge panel may not overrule a prior decision of the court," unless that decision has been

---

[2] In the district court, the Choctaw Nation filed a motion to stay the proceedings pending our decision in *Chickasaw*, acknowledging that *Chickasaw* would "necessarily *control*—the resolution of the exact same issues present here."  Respondents' Motion to Stay, *Caremark, LLC v. Choctaw Nation*, No. 2:21-cv-01554, ECF No. 16, at 2–3 (D. Ariz. Oct. 7, 2021).  The Nation reasserted these arguments in a motion to hold this appeal in abeyance, and described *Chickasaw* and this case as "virtually identical," and "substantially similar (if not identical)."  Motion to Hold Appeal in Abeyance, *Caremark, LLC v. Choctaw Nation*, No. 22-15543, Dkt. No. 16, at 2, 5 (9th Cir. May 26, 2022).

"effectively overruled" by a higher authority).  Therefore, we do not repeat our analysis in *Chickasaw*, but instead at this point merely summarize its holdings.  We will discuss *Chickasaw* again later in this opinion in further explaining why it forecloses many of the Choctaw Nation's arguments on appeal.

In *Chickasaw*, we concluded that the Chickasaw Nation "formed contracts with Caremark," "[a]nd the language of those contracts includes arbitration provisions with delegation clauses." *Chickasaw*, 43 F.4th at 1031.  We then applied the well-settled law that arbitrators, not courts, must resolve challenges to "the scope or enforceability of [an] arbitration provision" when the parties have "form[ed] an agreement to arbitrate containing an enforceable delegation clause." *Id.* at 1030.

We accordingly rejected the Chickasaw Nation's argument that its claims were not arbitrable "because it never clearly and unequivocally waived its tribal sovereign immunity," *id.* at 1028, and held that "whether there has been a waiver of tribal immunity for particular claims for which arbitration is sought" is an enforceability question delegated to the arbitrator, *id.* at 1032–33.  We acknowledged that "[a]n arbitration agreement may or may not have implications for a tribe's sovereign immunity," but held that "courts need not resolve the sovereign-immunity implications (if any) before deciding whether an agreement to arbitrate exists at all."**[3]** *Id.* at 1032.

---

[3] We explained that "a forum-selection clause—which, like an arbitration provision, is an agreement to bring any disputes to a particular forum—does not necessarily waive sovereign immunity" as to any

We also rejected the Chickasaw Nation's argument that its claims were not arbitrable because "the Recovery Act itself precludes the enforcement of any agreement to arbitrate." *Id.* at 1028. We held that challenges to arbitration on the ground that a statute precludes arbitration is a "threshold arbitrability issue that the parties have delegated to the arbitrator" to "decide in the first instance." *Id.* at 1034. We likened the argument that the Recovery Act displaces any arbitration provision to an unconscionability challenge. *Id.* at 1033 (citing *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 72 (2010)). That is, the argument that the Recovery Act displaces a contract's arbitration provision "does not impugn the validity of the delegation clauses specifically"; it instead "is a challenge to the enforceability of the arbitration provision[] as a whole," which is a threshold arbitrability issue "delegated to the arbitrator."**[4]** *Id.* at 1033–34. We expressed no opinion on the enforceability of the arbitration

particular claim. *Chickasaw*, 43 F.4th at 1032 (citing *Ute Indian Tribe of the Uintah & Ouray Rsrv. v. Utah*, 790 F.3d 1000, 1010 (10th Cir. 2015)). Therefore, we concluded that entering an arbitration agreement also does not necessarily waive sovereign immunity as to particular claims, but we declined to "put the cart before the horse" and decide whether immunity is waived for particular claims before deciding whether an arbitration agreement exists. *Id.* at 1032–33. Instead, we concluded that whether an arbitration provision with a delegation clause is enforceable as to particular claims is an issue that the arbitrator must decide in the first instance. *Id.* at 1034.

[4] The Choctaw Nation attempts to distinguish *Chickasaw* by asserting that it "expressly challenges" the enforceability and validity of the delegation clauses in its contracts with Caremark because it argues that the Recovery Act renders these clauses unenforceable. But this is simply a restatement of the argument that we rejected in *Chickasaw*, concluding that it raised a threshold arbitrability issue that the parties had delegated to the arbitrator because it did not "specifically" attack the validity of the delegation clauses. *See id.* at 1033–34.

provisions as to certain claims or whether the Recovery Act precluded arbitration of the Chickasaw Nation's claims.**[5]** *Id.*

Importantly for this appeal, however, in *Chickasaw* we expressly declined to decide whether "the Nation's sovereign immunity bar[red] Caremark from initiating a proceeding against the Nation in the Arizona district court to compel arbitration." *Id.* at 1033 n.11. We explained that the issue had not been "specifically and distinctly" argued in the opening brief or "adequately developed in the reply brief." *Id.* (quoting *Christian Legal Soc'y Chapter of Univ. of Cal. v. Wu*, 626 F.3d 483, 485 (9th Cir. 2010)); *see also Acres Bonusing, Inc. v. Marston*, 17 F.4th 901, 907 (9th Cir. 2021) (explaining that "[t]ribal sovereign immunity is 'quasi-jurisdictional,' in the sense that we do not raise the issue on our own," and therefore it may be considered an affirmative defense that is forfeited if not asserted (quoting *Pistor v. Garcia*, 791 F.3d 1104, 1110–11 (9th Cir. 2015))).

Although it did not raise this issue in the district court, the Choctaw Nation now asks us to decide the issue that we did not reach in *Chickasaw*: whether the Choctaw Nation waived its sovereign immunity to suit in the District of Arizona to compel arbitration. We conclude that by entering contracts with arbitration provisions, and agreeing that any

---

[5] In this appeal, the Choctaw Nation also asserts that the Recovery Act precludes arbitration under the "effective vindication" exception to arbitrability, "which permits the invalidation of an arbitration agreement when arbitration would prevent the 'effective vindication' of a federal statute." *Ferguson v. Corinthian Colls., Inc.*, 733 F.3d 928, 936 (9th Cir. 2013). Although we did not squarely address the effective vindication exception in *Chickasaw*, it is likewise "a challenge to the enforceability of the arbitration provisions as a whole" and therefore must be left "for the arbitrator." 43 F.4th at 1033. Thus, *Chickasaw* forecloses this argument too.

arbitration of its claims against Caremark would take place in Arizona and "agree[ing] to such jurisdiction," the Choctaw Nation expressly waived its sovereign immunity to suit in Arizona to compel arbitration. Accordingly, the District of Arizona had subject-matter jurisdiction to decide the petition to compel arbitration. *See Acres Bonusing*, 17 F.4th at 908 (collecting cases and explaining that when tribal sovereign immunity applies, the district court lacks subject-matter jurisdiction).

## II.

We have jurisdiction under 9 U.S.C. § 16(a)(3) and 28 U.S.C. § 1291. "We review de novo a district court's decision to grant or deny a petition to compel arbitration." *Chickasaw*, 43 F.4th at 1028. Likewise, whether a tribal nation has waived its sovereign immunity is reviewed de novo. *Bodi v. Shingle Springs Band of Miwok Indians*, 832 F.3d 1011, 1015 (9th Cir. 2016).

## III.

"The doctrine of tribal sovereign immunity derives from the status of Indian tribes as 'separate sovereigns preexisting the Constitution.'" *Id.* at 1016 (quoting *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788 (2014)). Tribes possess "the common-law immunity from suit traditionally enjoyed by sovereign powers." *Bay Mills*, 572 U.S. at 788 (internal quotation marks and citation omitted). And that immunity "is a necessary corollary to Indian sovereignty and self-governance." *Id.* (internal quotation marks and citation omitted).

"[A] tribe may lose its immunity from suit" in "only two ways": its tribal immunity may be abrogated by Congress, "[o]r, of relevance to this appeal, a tribe may itself waive

immunity." *Bodi*, 832 F.3d at 1016 (citations omitted). "It is well settled that a waiver of [tribal] sovereign immunity cannot be implied but must be unequivocally expressed." *Id.* (alteration in original) (internal quotation marks omitted) (quoting *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978)). Thus, "suits against Indian tribes are . . . barred" by sovereign immunity "absent a clear and unequivocally expressed waiver by a tribe or congressional abrogation." *Id.* at 1016–17 (alteration, internal quotation marks, and citations omitted).

The question presented here is whether the Choctaw Nation clearly and unequivocally waived its tribal sovereign immunity such that the District of Arizona had jurisdiction over Caremark's petition to compel arbitration. *See id.* Caremark asserts that the Nation waived its immunity to a suit in Arizona seeking to compel arbitration by entering contracts agreeing to arbitrate the parties' disputes in Arizona.**⁶** Specifically, Caremark argues that the Nation

---

[6] In addition to its arguments that the Nation contractually waived its sovereign immunity, Caremark also argues that the Nation waived its sovereign immunity from a suit to compel arbitration proceedings in the District of Arizona by filing a lawsuit against Caremark in the Eastern District of Oklahoma. The parties do not dispute that the "[i]nitiation of a lawsuit necessarily establishes consent to the court's adjudication of the merits of that particular controversy." *McClendon v. United States*, 885 F.2d 627, 630 (9th Cir. 1989). Thus, the Choctaw Nation acknowledges that it explicitly waived its sovereign immunity for its claims against Caremark by filing suit in the Eastern District of Oklahoma. And it concedes that the arbitration of these claims is inextricably intertwined with the resolution of those claims. But it argues that filing suit in the Eastern District of Oklahoma did not also waive its sovereign immunity as to Caremark's motion to compel arbitration proceedings in the District of Arizona. Because we conclude

contractually agreed to arbitrate any disputes arising under the Provider Agreements in Arizona, and explicitly "agree[d] to such jurisdiction." Accordingly, by executing the Provider Agreements, the Choctaw Nation waived its immunity in suits to compel arbitration proceedings in Arizona.

The Nation does not dispute that tribal nations may waive their sovereign immunity by contract. But it argues that the agreements its representatives signed here were insufficient do so—either because the agreements did not contain arbitration provisions or because, even if the agreements included such provisions, the Nation's tribal council did not authorize a waiver of its immunity. Therefore, we must determine whether the Nation clearly and unequivocally waived its sovereign immunity for arbitration proceedings in Arizona through these contractual provisions.

## A.

To determine whether the Choctaw Nation waived its sovereign immunity for arbitration proceedings in the District of Arizona through its contracts with Caremark, we must first determine whether those contracts were validly formed. *See Chickasaw*, 43 F.4th at 1030. The Nation acknowledges that it signed several Provider Agreements with Caremark to facilitate reimbursement of pharmacy costs. However, it argues that the Provider Agreements do not contain an arbitration provision; instead, that provision is in the Provider Manuals, which the Nation did not sign.

---

that the Nation contractually waived its sovereign immunity for arbitration proceedings in the District of Arizona, we need not decide this issue.

Therefore, the Nation argues, it did not enter any arbitration agreements with Caremark. [7]  We rejected the identical argument in *Chickasaw*, and we reject it again here because the Provider Agreements expressly incorporate the Provider Manuals. *Id.* at 1031.  Here, as in *Chickasaw*, the Nation "does not seriously dispute that its pharmacies have contractual relationships with Caremark that are governed by the terms of the Provider Manual[s]." *Id.* at 1030–31.

Indeed, the Choctaw Nation, like the Chickasaw Nation, "does not disavow the contracts entirely." *Id.* at 1031.  At oral argument, the Choctaw Nation suggested the contracts were partially valid, at least to the extent that the Nation received $90,500,000 in reimbursements for pharmacy claims from 2014 to 2021.  Thus, the Nation appears to recognize that it formed valid contracts with Caremark, even though it argues that the arbitration provisions in those contracts are unenforceable.  We therefore conclude that the contracts between the Choctaw Nation and Caremark, which are identical to the contracts at issue in *Chickasaw*, were validly formed.

---

[7] The Choctaw Nation, repeating the Chickasaw Nation's arguments, also suggests that Caremark "surreptitiously slipped [the arbitration provisions] into the Provider Manuals."  But it offers no support for this allegation, which is refuted by the undisputed record evidence that all Provider Agreements signed by the Choctaw Nation pharmacies expressly incorporate the Provider Manuals, that in 2007, 2009, 2011, 2014, 2016, 2018, and 2020, Caremark sent copies of the Provider Manuals to the Nation's pharmacies by Federal Express or UPS, and that Caremark maintains proofs of delivery for the Provider Manuals delivered by UPS from 2016 to 2020.

B.

The Nation next argues that even if its representatives had authority to contract with Caremark, they did not have authority to waive sovereign immunity and subject the Nation to arbitration proceedings in the District of Arizona. Thus, the Nation tacitly acknowledges that its representatives had authority to enter contracts with Caremark but argues that it did not waive its sovereign immunity in those contracts.  Specifically, the Nation contends that Choctaw law requires tribal council approval of every decision to waive sovereign immunity, which the signatories of the Provider Agreements lacked.  We reject this argument.

The Nation cites several cases to support its argument that it did not waive its immunity through any "authorized" arbitration provisions, and therefore, the district court did not have jurisdiction over the petition to compel arbitration. Most of these cases are inapposite because they address the enforceability of arbitration provisions when a tribe's enacted laws, constitutions, ordinances, and codes require specific procedures to waive immunity, and those provisions were not followed.  In these cases, the courts concluded that the purported waivers of sovereign immunity—through contracts that failed to comply with enacted tribal laws governing such waivers—were not "clear and unequivocally expressed" and therefore were ineffective.[8]  *See Bodi*,

---

[8] *See Sanderlin v. Seminole Tribe of Fla.*, 243 F.3d 1282, 1287–88 (11th Cir. 2001) (rejecting argument that tribal official implicitly waived immunity for Rehabilitation Act suits by applying for federal funding because tribal constitution and ordinance required resolution from tribal council to waive immunity); *World Touch Gaming, Inc. v. Massena*

832 F.3d at 1016–17 (citations omitted). But the Choctaw Nation has not identified any specific tribal laws that apply here; thus, it has not identified any conflict between its laws and the terms of the Provider Agreements that would render any contractual waiver of immunity unclear or equivocal. The remaining cases that the Nation cites, which address invalid contract formation, are not helpful because they turn on specific facts that are not applicable or relevant here.[9]

_____

*Mgmt., LLC*, 117 F. Supp. 2d 271, 272, 274–75 (N.D.N.Y. 2000) (concluding that tribe did not waive its immunity under terms of sales and lease agreements that management company signed because the tribe's constitution and civil judicial code required express, written waiver by tribal council to waive immunity); *Calvello v. Yankton Sioux Tribe*, 584 N.W.2d 108, 110, 112–13 (S.D. 1998) (concluding that tribal constitution and bylaws required that tribal council authorize agreements, and rejecting argument that tribe waived immunity through attorney's unauthorized participation in arbitration, or by entering gaming compact with the state); *Dilliner v. Seneca-Cayuga Tribe*, 258 P.3d 516, 520 (Okla. 2011) (concluding that tribe's constitution required that tribe's business committee pass resolutions to expressly consent to a waiver of immunity, but resolutions at issue only authorized the chief to enter employment contracts and did not authorize waiver of immunity); *Chance v. Coquille Indian Tribe*, 963 P.2d 638, 641–42 (Or. 1998) (finding that purported waiver of immunity was unenforceable because tribal corporation's articles of incorporation required board approval for president to enter contracts on corporation's behalf, and the board had not approved the contract at issue).

[9] *See Stillaguamish Tribe of Indians v. Pilchuck Grp. II, LLC*, No. C10-995RAJ, 2011 WL 4001088, at *5–7 (W.D. Wash. Sept. 7, 2011) (explaining that contract clearly waived immunity, but concluding that the tribe did not enter the contract); *Attorney's Process & Investigation Servs., Inc. v. Sac & Fox Tribe*, 401 F. Supp. 2d 952, 963 (N.D. Iowa 2005) (finding that agreement containing arbitration clause clearly waived tribe's sovereign immunity, but declining to reach that issue because "the very validity of the Agreement [was] in dispute" as the

Thus, these cases do not support the Nation's argument that it did not authorize its signatories to the Caremark contracts to waive its tribal sovereign immunity for arbitration proceedings in the District of Arizona.

In the absence of tribal law on point, the Nation relies on a declaration from its Executive Director of Legal Operations, Mr. Brian Danker, asserting that only the tribal council may waive the Nation's immunity, and that the council did not authorize anyone to sign agreements with Caremark that included a waiver of immunity.[10] Mr. Danker bases these statements on his purported knowledge of the Nation's "standing policy," and his "experience." But as an initial matter, even if we accepted Mr. Danker's opinions on

tribal court was required to resolve an intra-tribal conflict between competing councils claiming authority to act on behalf of the tribe); *Hydrothermal Energy Corp. v. Fort Bidwell Indian Cmty. Council*, 216 Cal. Rptr. 59, 61–63 (Ct. App. 1985) (concluding that contract the tribal chairman purportedly entered was not valid because under the tribe's constitution and bylaws only the tribal council had authority to enter contracts, and chairman stated by declaration that she signed contracts at plaintiff's request for "limited bookkeeping purposes" and informed the plaintiff's agent of the tribal procedure that required council approval of any contract); *MM&A Prods., LLC v. Yavapai-Apache Nation*, 316 P.3d 1248, 1250–54 (Ariz. Ct. App. 2014) (explaining that tribe's constitution and "Board Act" required the tribal council to authorize contracts, which it had not done, and rejecting argument that casino marketing director nonetheless had "apparent authority" to enter the contracts and bind the tribe)

[10] Mr. Danker's declaration is identical to the declaration submitted to make the same argument in *Chickasaw*, except for the name, title, and employment history of the declarant. *Compare* Appellants' Excerpt of Record at 23–26, *Caremark, LLC, et al. v. Choctaw Nation, et al.*, (No. 22-15553), ECF No. 26 (Jan. 9, 2023), *with* Appellants' Excerpts of Record at 18–21, *Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021 (9th Cir. 2022) (No. 21-16209), ECF No. 28 (Sept. 1, 2021).

Choctaw law, his statements do not address the relevant period. He avers that he has served as counsel for the Choctaw Nation since December 2018, and he signed the declaration in November 2021. Therefore, at the time he signed the declaration, he had approximately three years' experience as counsel for the Nation, all of which occurred years after the parties entered the Provider Agreements between 2003 and 2010, and after Caremark sent the incorporated Provider Manuals to the Nation in 2007, 2009, 2011, 2014, 2016, and 2018. Mr. Danker provides no other information to suggest he has additional experience or knowledge to provide foundation for his opinions on the Choctaw Nation's laws and procedures prior to December 2018. Therefore, his statements, which seem to be offered as lay opinions about Choctaw law, are not helpful or authoritative.

Nonetheless, even if we consider the substance of Mr. Danker's opinions, they do not advance the Nation's arguments. Mr. Danker states that, "[a]s a matter of Choctaw Nation law, only the Choctaw Nation Tribal Council may waive the Choctaw Nation's sovereign immunity."[11] But he cites no Choctaw law to support this statement. And as Caremark notes, the Choctaw

---

[11] Some of Mr. Danker's statements are more properly characterized as advocacy. He asserts that "the Choctaw National Tribal Council [has not] signed any agreement with any Petitioner named in the above-referenced matter that contained any waiver of the Choctaw Nation's sovereign immunity." That statement, however, simply repeats the Nation's arguments, which we rejected in *Chickasaw* and here, that its representatives did not sign agreements that contained arbitration provisions because they signed the Provider Agreements, and the arbitration provisions are in the Provider Manuals. *See supra* Section III.A.

Constitution does not contain any such restriction.  *See Constitution of the Choctaw Nation of Oklahoma*, https://www.choctawnation.com/about/history/historical-documents/ (last visited June 3, 2024).

The Nation argues that it need not point to enacted tribal law establishing procedures or restrictions for waiving sovereign immunity because "a tribe . . . can proceed by common law and constitutional principles, as well as by statute."  But even if true, this is beside the point.  Here, the Nation has not identified *any* tribal law that governs waiver of sovereign immunity.

Instead, the Nation argues that even if it entered valid contracts with Caremark, and those contracts contain arbitration provisions that waive sovereign immunity to participating in the arbitration, it can nonetheless disavow any such waiver with a declaration that is not supported by any tribal law.  But as set forth above, the cases that the Nation cites to support this argument are inapposite; these cases address the enforceability of arbitration provisions when enacted tribal laws, constitutions, ordinances, and codes require specific procedures to waive immunity and those procedures are not followed.  *See* cases cited *supra* note 8.  The Nation has not cited any authority to support the proposition that, in the absence of any tribal law governing or restricting waivers of immunity, a tribe can sign otherwise enforceable contracts that include arbitration provisions, reap the financial benefits of these contracts, and then invalidate the arbitration provisions by having its legal counsel declare them invalid based on unspecified tribal law and policy.

In addition to lacking legal support, that proposition would violate the *caveat emptor* principle underlying cases

addressing tribal sovereign immunity: that parties entering contracts with Native American tribal nations are, or should be, aware of the principles of sovereign immunity and should negotiate with the tribes accordingly to ensure that their agreements are valid and binding. *See, e.g.*, *Bay Mills*, 572 U.S. at 797 ("So as Michigan forthrightly acknowledges, 'a party dealing with a tribe in contract negotiations has the power to protect itself by refusing to deal absent the tribe's waiver of sovereign immunity from suit.'"); *World Touch Gaming*, 117 F. Supp. 2d at 275–76 (noting that "as a sophisticated distributor of gaming equipment that frequently deals with Indian gaming enterprises, World Touch should have been careful to assure that . . . the Tribe . . . expressly waived sovereign immunity" in the agreements); *cf. Wells Fargo Bank, Nat'l Ass'n v. Apache Tribe of Okla.*, 360 P.3d 1243, 1253 (Okla. Ct. App. 2014) (explaining that "the harder it is for the tribe to waive its sovereign immunity, the harder it is for it to make advantageous business transactions" (quotation marks and citation omitted)).

Accepting the Nation's argument would mean that parties dealing with a tribe would have no means of ensuring that a contract provision that waives sovereign immunity would be effective because, even if that party researched tribal law and found no provisions governing immunity waivers, the tribe could later simply invalidate the provision with a declaration from its counsel that cites no tribal law. In these circumstances, the party's attempts to identify the applicable tribal law would be futile because, according to the Nation's position, that law need not be enacted or otherwise documented in the tribe's common law.

Therefore, we conclude that the Nation did not establish by its citation to inapposite cases, or by the declaration from

its legal counsel, that any waiver of sovereign immunity in the arbitration provisions in its agreements with Caremark is unenforceable because the tribal representatives who signed the contracts lacked authority to waive the Nation's sovereign immunity.

C.

Finally, we must determine whether, under the terms of the valid contracts it entered with Caremark, the Choctaw Nation clearly and unequivocally waived its sovereign immunity for arbitration proceedings such that the District of Arizona had jurisdiction over the petition to compel arbitration.[12] *See Bodi*, 832 F.3d at 1016; 9 U.S.C. § 4. The Provider Agreements and the incorporated Provider Manuals state that "[a]ny and all disputes between Provider and Caremark . . . will be exclusively settled by arbitration," and specify that "[a]ny such arbitration must be conducted in Scottsdale, Arizona and Provider agrees to such jurisdiction, unless otherwise agreed to by the parties in writing." The arbitration provision also adopts the AAA Commercial Arbitration Rules and Mediation Procedures, which provide that "[p]arties to an arbitration under these Rules shall be deemed to have consented that judgment upon the arbitration award may be entered in any federal or state

---

[12] By construing the contracts' arbitration provisions to determine whether the district court had jurisdiction over the petition to compel arbitration, we do not "put the cart before the horse," *Chickasaw*, 43 F.4th at 1032–33, because we have already determined that an arbitration agreement exists, *see supra* Section III.A, and we are not determining whether the Nation waived its sovereign immunity as to any particular claim. Instead, we are addressing whether the Nation waived its immunity from a motion to compel arbitration, which is a threshold issue because when tribal sovereign immunity applies, the district court "lack[s] subject matter jurisdiction." *Acres Bonusing*, 17 F.4th at 908.

court having jurisdiction thereof." *See* Am. Arb. Ass'n, *Commercial Arbitration Rules and Mediation Procedures* R-54(c) (Sept. 1, 2022).[13]   And the arbitration provision provides that "[t]his arbitration agreement . . . shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1–16." Thus, unlike in *McClendon*, where we concluded the tribe had not waived its immunity, the "relevant documents in this case" are not "silent with respect to the [Nation]'s consent to suit" in Arizona.  885 F.2d at 632 (concluding that tribe had not waived sovereign immunity where its contractual documents presented no indication of "an intent to waive sovereign immunity" and "contain[ed] no provision governing sovereign immunity or consent to suit").

Instead, the arbitration provision at issue here is remarkably similar to the arbitration provision at issue in *C & L Enterprises, Inc. v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 532 U.S. 411 (2001).  There, the Court concluded that the Potawatomi Nation "clearly consented to arbitration and to the enforcement of arbitral awards in Oklahoma state court," and "thereby waived its sovereign immunity from C & L's suit" to enforce an arbitration award. *Id.* at 423.  The "contract's provision for arbitration and related prescriptions [led the Court] to this conclusion." *Id.* at 418.  The arbitration clause stated, like the one at issue here, that "[a]ll claims or disputes between [the parties] . . . shall be decided by arbitration." *Id.* at 415. And, like the arbitration provision here, it adopted the AAA rules providing that "the arbitration award may be entered in any federal or state court having jurisdiction thereof." *Id.*

---

[13] For current and archived versions of these rules, *see Rules, Forms, Fees,* American Arbitration Association, http://www.adr.org/archiverules (last visited June 3, 2024).

at 419 (quoting Am. Arb. Ass'n, *Construction Industry Dispute Resolution Procedures* R-48(c) (Sept. 1, 2000)).

Thus, the Court concluded that "the Tribe agreed, by express contract, to adhere to certain dispute resolution procedures," *id.* at 420, and the arbitration clause "memorialize[d] the Tribe's commitment to adhere to the contract's dispute resolution regime," *id.* at 422. The Court rejected the tribe's argument that the arbitration agreement did not waive its immunity for judicial enforcement of the arbitration award specifically. *Id.* The Court explained that the dispute resolution regime agreed to by the parties "has a real world objective; it is not designed for regulation of a game lacking practical consequences." *Id.* In other words, "[t]he arbitration clause . . . would be meaningless if it did not constitute a waiver of whatever immunity [the Tribe] possessed." *Id.* (second alteration in original) (quoting *Native Vill. of Eyak v. GC Contractors*, 658 P.2d 756, 760 (Alaska 1983)).

To be sure, the procedural context in *C & L Enterprises* differed from this case. There, the Court was deciding whether the tribe had waived its immunity from suit to enforce an arbitral award against it. *Id.* at 414. But the Court's reasoning applies with equal force to the issue presented here: whether under the express terms of the Provider Manuals—in which the Nation agreed to arbitrate its disputes with Caremark and further agreed that any arbitration "must be conducted in Scottsdale, Arizona and Provider agrees to such jurisdiction"—the Nation waived its immunity as to a motion to compel arbitration proceedings brought in the District of Arizona, the jurisdiction where any arbitration is to take place under the arbitration agreement. Just as the arbitration provision in *C & L Enterprises* embodied "the real world end" of "judicial enforcement of

the resolution arrived at through arbitration," *id.* at 422, the arbitration clause here reflects the real world end of permitting suit in a competent jurisdiction to initiate the arbitration proceedings that the parties' agreement otherwise plainly allows.

Like the contract in *C & L Enterprises*, the incorporated Provider Manuals here clearly and unambiguously waive the Nation's sovereign immunity from arbitration proceedings in the District of Arizona.  *See id.* at 418–19; *see also id.* at 420–21 (concluding that the parties, through the arbitration clause, unambiguously agreed to submit disputes arising under a contract to arbitration, and rejecting the suggestion that "to be deemed explicit" a waiver of sovereign immunity "must use the words 'sovereign immunity'" because "[n]o case has ever held that") (quoting *Sokaogon Gaming Enter. Corp. v. Tushie-Montgomery Assocs., Inc.*, 86 F.3d 656, 659–60 (7th Cir. 1996)); *Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth.*, 207 F.3d 21, 31 (1st Cir. 2000) (concluding that the forum-selection clause was "nose-on-the-face plain" because it committed "[a]ll claims, disputes and other matters . . . arising out of or relating to [the contract] to arbitration" (internal quotation marks omitted) (alterations in original)).  The Provider Agreements (through the incorporated Provider Manuals) memorialized the Nation's commitment to the dispute resolution regime that the agreements required, and that commitment came with practical consequences: the Nation agreed that any arbitration would take place "in Scottsdale, Arizona and Provider agrees to such jurisdiction."

The Choctaw Nation tries to avoid this conclusion by arguing that *C & L Enterprises* is distinguishable because there, "the *Tribe itself* had prepared the contract containing

the arbitration provision." Here, Caremark drafted the Provider Agreements. But the identity of the party drafting the contracts in *C & L Enterprises* was irrelevant to the Court's waiver analysis. *See* 532 U.S. at 423. Although the Court pointed out that the tribe had proposed a "standard form construction contract" and inserted "details not set out in the form," *id.* at 414–15, it did so only to dismiss the tribe's suggestion that a form contract could not waive tribal sovereign immunity, *id.* at 423. The Court noted that "[i]n appropriate cases," when applying the common-law rule of contract interpretation, ambiguous language in a contract could be construed against the drafter. *Id.* However, the Court explained that rule was "inapposite" because the contract at issue was not ambiguous. *Id.*

The same reasoning defeats the Nation's argument that *C & L Enterprises* cannot apply here because Caremark drafted the Provider Agreements and Manuals. Those contracts are not ambiguous, and the Nation does not argue otherwise or claim that it was forced into adhesion contracts. Because there is no contractual ambiguity, the fact that the Nation did not draft the Provider Agreements or Manuals is irrelevant to whether it waived its sovereign immunity for arbitration proceedings in Arizona, just as the fact that the tribe drafted the contracts was irrelevant to the Court's waiver analysis in *C & L Enterprises*. *See id.* Thus, *C & L Enterprises* compels the conclusion that the Nation contractually waived its sovereign immunity for a motion to compel arbitration in Arizona.

## IV.

We conclude that the District of Arizona had jurisdiction over Caremark's petition to compel arbitration, and we affirm the district court's order compelling arbitration. In

step with *Chickasaw*, we take no position on the enforceability of the arbitration provisions because that issue is delegated to the arbitrator. *See* 43 F.4th at 1034.

**AFFIRMED.**